GUARANTY TRUST CO. OF NEW YORK et al. v. ATLANTIC COAST
ELECTRIC R. CO.

(Circuit Court of Appeals, Third Circuit.   June 1, 1905.)

Nos. 8 and 9.

1. STREET RAILROADS—MORTGAGES—DATE—CONSTRUCTION.
    Where the authority for the execution of a street railroad mortgage,
    and bonds secured thereby, not given until October 7, 1896, required the
    mortgage and bonds to be antedated as of July 1, 1896, and they were
    so antedated, as between the mortgagor and mortgagee the mortgage
    would be considered as a conveyance of property on the day the mort-
    gage and bonds were dated.

2. SAME—AFTER–ACQUIRED PROPERTY—LIEN.
    A street railway mortgage given to secure bonds recited the form of
    the bonds, and declared that they were secured by a mortgage on all
    the certain railroad and other property, real and personal, and franchises
    of the railroad company, then owned or thereafter acquired by it.   The
    mortgage conveyance clause limited its lien on after-acquired property
    to rights acquired by lease from other railroad companies, as "should be
    connected with or appurtenant to" the railroad of the mortgagor, spe-
    cifically described.   Held, that the mortgage lien embraced rights ac-
    quired by lease made after its date to the mortgagor by other railroad
    companies owning roads connected with the mortgagor's railroad and
    operated in connection therewith, the capital stock of and a lease from
    a new corporation organized merely for the purpose of holding title to
    the road of another company similarly operated, all of which was owned
    by the mortgagor, together with a line of railroad subsequently con-
    structed by the mortgagor, and operated in connection with its system.

3. SAME—SUBSEQUENTLY ACQUIRED LIENS.
    Where a street railway mortgage given to a trustee to secure bonds
    covered after-acquired property, and the trustee was requested to issue
    110 of the bonds so secured for the purchase of the assets of a connect-
    ing street railway company sold at a receiver's sale, which it did, and such
    assets were conveyed to a new corporation, all of the stock of which
    was delivered to the mortgagor, and operated by it in connection with
    its system, such trustee was charged with notice that the assets so pur-
    chased were, in equity, subject to the mortgage, and hence the trustee
    could not acquire a superior lien on such assets by a subsequent pledge
    of the stock of such corporation to secure a loan subsequently made to
    the mortgagor.

Appeal from the Circuit Court of the United States for the Dis-
trict of New Jersey.

For opinion below, see 132 Fed. 68.

Wm. A. Glasgow, for Tracy et al.
Julien T. Davies, Jr., for Trust Co.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge.   These are cross-appeals from the decree
of the Circuit Court of the United States for the District of New
Jersey, foreclosing a mortgage made by the Atlantic Coast Electric
Railroad Company, a corporation of the state of New Jersey, to the
Guaranty Trust Company of New York, a corporation of the state
of New York, trustee, dated July 1, 1896, to secure an issue of bonds,
known as General Mortgage 5 Per Cent. Bonds, to the amount
of $500,000.   A committee of these bondholders, who were allowed

to intervene in the Circuit Court, have appealed from a portion of the decree which adjudicates that the Guaranty Trust Company, the mortgagee, has individually, and not as trustee, a lien upon certain shares of stock pledged to it superior to the lien of the mortgage securing said bonds. The defendant railroad company appeals from certain other portions of the decree adjudging that the mortgage is a lien upon certain leasehold interests and upon an extension of the line of railway described in the mortgage.

The material facts as disclosed by the record are as follows:

The general mortgage under foreclosure is dated July 1, 1896. It was acknowledged October 8, 1896, and recorded October 13, 1896. The resolution, authorizing the execution and delivery of the mortgage, was adopted October 7, 1896. On that date, the interest of the Atlantic Coast Electric Railroad Company, the defendant, in the different lines of the system it was operating, was as follows:

(1) The original line owned and operated by it under its incorporation, extended from a point in Asbury Park to the north side of Brighton avenue in Long Branch.

(2) The line of road from Brighton avenue north to Atlantic avenue was that of the West End & Long Branch Railway Company, all of whose capital stock, viz., $100,000, was owned by the defendant company. All the property of the West End Company was leased to the defendant company, by instrument dated August 3, 1896.

(3) A short line with a loop extending from Atlantic avenue to Pleasure Bay Landing, was owned absolutely by the defendant company.

(4) The lines in Asbury Park were those of the Seashore Electric Railway Company, a corporation of the state of New Jersey, 1,500 shares of whose capital stock, out of a total issue of 2,000 shares, were owned by the said defendant company. The property of the Seashore Electric Railroad Company was leased to the defendant company, by instrument dated August 3, 1896.

It will be observed that the leases of the Seashore & West End Railroads, above mentioned, were made August 3, 1896, prior to the execution and delivery of the mortgage on October 7, 1896, but after its date, July 1, 1896. All of the above-mentioned properties were already subject to a first mortgage of the defendant company, dated April 27, 1895, made to the Knickerbocker Trust Company, to secure an issue of first mortgage bonds of the aggregate amount of $1,000,000. With this mortgage, however, we are not here concerned. It appears, therefore, that from and after August 3, 1896, and on until its acquisition of the Asbury Park & Belmar Street Railway Company, in May, 1898, the defendant company substantially owned, controlled and operated a line or system of railways, extending from Pleasure Bay Landing southwardly to the lines of the said Asbury Park & Belmar Street Railway Company. After the last-mentioned date, when, in the manner hereinafter more particularly described, the defendant company acquired the railway of the Asbury Park & Seagirt Railway, there was a further

extension of its line southwardly, and it practically owned and operated the system or line thus extended.   It afterwards constructed and owned what was called the Belmar Extension, about a mile and a half long, connecting with what was formerly the Asbury Park & Belmar Road, and constituting a continuation of its line.

At the beginning of the foreclosure suit, therefore, the line or system operated, owned and controlled by the defendant company, extended from Pleasure Bay Landing through the short line owned by the defendant company, to the line of the West End & Long Branch Railway Company, over said line to the original line of the defendant company, then over and through the line of the Seashore Electric Railroad Company in Asbury Park, to the line of the former Asbury Park and Belmar (now the Asbury Park & Seagirt) Road, and then over the Belmar extension of the latter road to its terminus.   The subjoined diagram, furnished in the brief of the defendant company, will serve to exhibit the relative positions of these several lines, though not their relative length:

| 6. | 5. | 4. | 1. | 2. | 3. |
|---|---|---|---|---|---|
| Belmar Extension.  Constructed and owned by defendant company | Asbury Park & Seagirt Road, all of whose stock has been issued to defendant company and property leased to said company. | Seashore Electric Railway Company, 1,500 shares of whose stock out of 2,000 shares, is owned by defendant company.  Leased to defendant company August 3, 1896. | Atlantic Coast Electric Railroad Company (defendant company). | West End & Long-Branch Railway Company, all of whose stock, $100,000, is owned by defendant company.  Leased to defendant company August 3, 1896. | Atlantic Coast Short Line from Atlantic Avenue to Pleasure Bay Landing, owned by defendant company. |

The appellants, the intervening bondholders, claim that the lien of the mortgage securing their bonds, covers all the property of the line or system thus indicated and described, whether acquired by the defendant company before or after the date of the mortgage, by virtue of certain after-acquired property provisions in the said mortgage, alleged to be sufficient for that purpose.   By the cross-appeal of the appellant company, it is contended that, by a proper construction of the language and terms of the mortgage, its lien only extends to the original Atlantic Coast Electric Railroad Company and to the short line from Atlantic avenue to Pleasure Bay Landing, owned at the time by the defendant company (being Nos. 1 and 3 of the diagram), and to such property as was strictly appurtenant thereto, which, it is contended, would not include the other lines of railway above mentioned, and indicated in the diagram as Nos. 2, 4, 5 and 6.

There is no controversy as to the complainant being entitled, as trustee, to a decree for the sale of the mortgaged property.   The only questions to be considered here, as in the court below, relate to the extent of the lien of the mortgage.   As we think there was no error in the decree of the court below, so far as it related to those properties embraced in the railway system or line of the defendant company, other than that of the Asbury Park & Seagirt Railway, we cannot do better than refer to, and adopt as our own, that part

of the opinion of the learned judge of the court below, which deals
with the mortgage lien on this property. It is as follows:

"Admittedly, the mortgage covers all the properties specifically described
in it. But does it also extend to and embrace the following properties ac-
quired by the defendant company after the date of the mortgage—the lease-
hold interest in the West End & Long Branch Railroad, the leasehold inter-
est in the Seashore Electric Railroad, the leasehold interest in the hotel
property at Pleasure Park Bay, the capital stock of and the leasehold in-
terest in the Asbury Park & Seagirt Railroad, and the line of railway ex-
tending through Belmar? The defendant insists that none of these last-
mentioned properties are subject to the lien of the mortgage; the complain-
ant insists that all of them, except the capital stock of the Asbury Park &
Seagirt Railroad, which the complainant claims to hold in its individual ca-
pacity as collateral security for the payment of the defendant's promissory
note, are subject to its lien; and the bondholders, who are represented by
special counsel, insist that all of the properties, including the stock of the
Asbury Park & Seagirt Railroad, are subject to its lien.

"Although the authority for the execution of the bonds and mortgage was
not given until October 7, 1896, and the mortgage was not recorded un-
til October 13, 1896, the resolution authorizing their execution required
them to be antedated July 1, 1896. They were so antedated. As between
mortgagor and mortgagee, therefore, the mortgage will be considered as
a conveyance of property on July 1, 1896. This was the plain intention
of the defendant company, and property acquired by that company between
the date of the mortgage and the time of authorizing its execution, or of
recording it, as well as that acquired after such authority or record, must be
deemed to be future-acquired property. If, then, the mortgage covers any fu-
ture-acquired property at all, the mere fact that two leasehold interests—
one in the West End & Long Branch Railroad Company and the other in the
Seashore Electric Railway Company—were acquired after the date of the
mortgage but before the authority for its execution was given, will not ex-
clude them from the lien thereof.

"The mortgage is inartistically drawn. Whether it was the intention of
the defendant company to subject to the lien of its mortgage after-acquired
properties like those above mentioned must be ascertained from an examina-
tion of the various clauses in the mortgage concerning after-acquired prop-
erties. On such examination it appears that the mortgagor conveyed to the
mortgagee 'all the right, title and interest of the railroad company [the
mortgagor] now owned, or hereafter in anywise acquired by it, in and to all
and singular the lines of railroad and railroad tracks and routes and other
property, real and personal, hereinbelow described.' Then follows, first, a
specific description of the lines of railroad owned by the defendant company
on July 1, 1896. Secondly, the description embraces 'all lands and real es-
tate * * * buildings, improvements, tenements and hereditaments, now
owned by the railroad company, or hereafter at any time or howsoever ac-
quired by it, which are or may be connected with or appurtenant to the
above described and hereby mortgaged railroad and routes.' Thirdly, the
description embraces 'all and every franchise [including the franchise to be a
corporation], right, privilege and easement of whatsoever kind or nature,
now or hereafter at any time or howsoever owned, acquired, possessed, en-
joyed or exercised by the railroad company, either by virtue of any act of the
Legislature of the State of New Jersey, or * * * of any contract or lease
between the railroad company and any other railroad or other corporation
* * * which are or may be connected with or appurtenant to the above
described and hereby mortgaged railroad and routes.' The description fur-
ther embraces 'all and singular the liberties, privileges and franchises con-
nected with or relating to the said railroad, routes and real and personal
property hereto [hereby] mortgaged * * * with all and singular the
* * * hereditaments, easements and appurtenances to the above described
and hereby mortgaged railroad routes and real and personal property, fran-
chises and premises, or any part thereof, now or hereafter belonging or in
any wise appertaining.'

"The defendant insists that these clauses relating to future-acquired property are limited to the railways specifically described in the mortgage and to properties appurtenant to such specifically described railways, and that they do not include subsequently acquired leases or stocks, or even the line of railroad constructed through Belmar. To determine the question, the meaning of the words 'connected with or appurtenant to' must be ascertained. The phrases 'connected with' and 'appurtenant to' are not necessarily synonymous. The railroad of the West End & Long Branch Railway Company is physically connected with that of the defendant company at the northerly end of the latter company's main line, and the railroad of the Seashore Electric Railway Company is physically connected with that of the defendant company at the southerly end of the latter company's main line. The defendant company secured leases upon these two lines of railroad and has been operating them in connection with its own road. In Columbia Finance & Trust Co. v. Kentucky Union Railway Co., 60 Fed. 794, 9 C. C. A. 264, it appears that the defendant company in that case executed a mortgage upon its line of railroad, which is specifically described therein, and also upon 'the lands, real estate, telegraph lines, railroad tracks, side tracks, bridges, * * * and all other things of whatever kind, belonging or in anywise appertaining, or which have been or may be acquired or provided for use upon or in connection with said railroad, * * * and also all locomotives * * * and other chattels now or hereafter belonging to or appertaining to said railroad, and all property, both real and personal, of every kind and description, which shall hereafter be acquired for use on said railroad, and all the corporate rights, privileges, franchises and immunities, and all things in action, contracts, claims and demands of the said party of the first part, whether now owned or hereafter acquired, in connection or relating to the said railroad.' Here, it will be observed, the clauses relating to after-acquired property were also limited to the preceding specifically described line of railroad. Yet it was held that the lien of the mortgage covered a leasehold interest in another connecting railroad acquired by the defendant company after the execution of the mortgage.

"In the mortgage now being foreclosed, every 'right' of the defendant company, acquired after the date of the mortgage by lease from any other railroad company, was by express terms included in the lien of the mortgage, provided such 'right' should be 'connected with or appurtenant to' the railroad therein specifically described. As already stated, the defendant company has been operating the leased railroads in connection with its own road. It has been in possession of and has been exercising the rights acquired by the leases. These rights, if not appurtenant to, are, within the fair meaning of the language of the mortgage, 'connected with' the defendant's railroad. Unless such construction be adopted, the clause of the mortgage relating to rights acquired by lease seems to have no force or effect whatever. If there be doubt as to the true meaning of this clause, or of any other of the clauses relating to after-acquired property, the construction put upon them by the parties to the mortgage at the time of its execution, and the acts done by those parties, may be resorted to as aids in ascertaining their true meaning. 1 Gr. Ev. § 293; Bradley v. Packet Co., 13 Pet. 89, 10 L. Ed. 72; Reed v. Merchants' Mutual Ins. Co., 95 U. S. 23, 24 L. Ed. 348. And in Central Trust Co. v. Kneeland, 138 U. S. 414, 11 Sup. Ct. 357, 34 L. Ed. 1014, the court resorted to the language of the prospectus, issued for the purpose of inviting investors to purchase the bonds of the Toledo, Delphos & Burlington Railroad Company, and to the language of the resolution of the directors of the company, authorizing the execution of the mortgage intended to secure those bonds, for the purpose of confirming the construction given by the court to the after-acquired property clause of the mortgage. In the case now in hand we find the resolution of the directors of the defendant company, passed October 7, 1896, embodied in full the form of bonds intended to be secured by the mortgage and expressly approved that form. We also find that the same form of bonds is quoted in full in the recitals of the mortgage. These bonds declared that they were secured by a mortgage conveying to the trustee (the complainant in this case) 'all the certain railroad and other property, real and personal, and franchises of said railroad company, wheth-

er now owned or hereafter acquired by it.' It thus appears that not only were the holders of these bonds informed that their mortgage security was intended to apply to and cover all after-acquired property of the defendant company, but that all other creditors of the defendant company received notice of such information and intention when the mortgage was placed on record. While the language of the mortgage, in its conveyance clauses, seems to restrict its lien upon after-acquired property to such property as is connected with or appurtenant to the railroad lines specifically described, and thus to limit the language of the bonds, the rights acquired by the two leases from the West End & Long Branch Railroad Company and the Seashore Electric Railway Company must, in view of all the facts above stated, be deemed connected with or appurtenant to the specifically described railroad lines of the defendant company, and to be subject to the lien of the mortgage."

It remains to consider the lien of the mortgage, as respects the Asbury Park & Seagirt Railway Company. The railway of this company, as we have seen, is an important link in the system or line of the defendant company between Pleasure Bay Landing and the terminus of the Belmar Extension. Some time prior to March, 1898, a reorganization committee of the bondholders of the Asbury Park & Belmar Street Railway Company had, under a decree of the United States Circuit Court, acquired title to the property rights and franchises of said company, and to its railroad and routes. On the date last mentioned, the directors of the defendant company passed the following resolution, for the purchase of the property held by this reorganization committee:

"Whereas, Messrs. Acton C. Hartshorne and G. B. M. Harvey, acting as a reorganization committee and in representing themselves and other owners of the first and second mortgage-bonds of the Asbury Park & Belmar Street Railway Company, have acquired title under a decree of the United States Circuit Court to the property, rights and franchises of the Asbury Park and Belmar Street Railway Company, and to its railroad and routes; and

"Whereas said reorganization committee have offered to dispose of the same to this company; be it therefore

"Resolved, that this company purchase from said reorganization committee the property above described upon the following terms:

"First. This company to execute and deliver to the Monmouth Trust & Safe Deposit Company, as trustee, a purchase-money first mortgage of the amount of $50,000 upon the railroad and other property so purchased, securing fifty twenty-year gold bonds bearing five per cent. interest of $1,000 redeemable at the option of the company, at 105, the interest thereon to be paid semiannually, on the first days of September and March, and said bonds, when issued, to be delivered to or on order of said reorganization committee.

"This company to deliver to or on the order of said committee, or either of them, 110 of its general mortgage bonds now held in the treasury of the company, and to issue to or on the order of the said committee, or either of them, 5,000 shares of the capital stock of this company."

The mortgage in suit, made by the defendant company to the complainant, contains the following specific provision in regard to the issue of the 500 bonds to be secured thereby:

"Three hundred and fifty of the issue secured hereby shall be certified by the trustee and issued to or upon the order of the railroad company for the purposes of its business from time to time, upon its demand expressed by a resolution of its Board of Directors, and each of such resolutions shall constitute full authority and protection to the trustee in certifying bonds in accordance therewith. The remaining one hundred and fifty of the hereby secured bonds shall be certified and issued only for the purpose of making

payment for additions to and extensions of the railroad of the railroad company, or for a new power house or additional machinery, or any of said purposes, from time to time, upon receipt by the trustee of a resolution of the Board of Directors of the railroad company, stating the amount of bonds required and the purpose for which the same are to be used, and accompanied by a certificate signed by the president and treasurer of the railroad company that the bonds so called for have been disposed of for one or more of the purposes herein mentioned; and each such resolution and certificate shall constitute full authority and protection to the trustee in certifying bonds in accordance therewith."

It is important to observe that the mortgage, accepted and held in trust by the complainant trust company, makes this careful provision concerning the issuance of the $150,000 of said bonds, and that pursuant thereto, on the 20th day of April, 1898, the defendant company passed the following resolution, a copy of which was delivered to the complainant:

"Whereas, by the terms of the general mortgage of this company to the Guaranty Trust Company of New York, as trustee, securing bonds of this company to the amount of $500,000, it is provided that $150,000 of said bonds shall be certified and issued only for the purpose of making a payment for additions to and extensions of the railroad of this company from time to time, upon receipt of the trustee under said mortgage, and by the resolution of the board of directors of this company stating the amount of bonds required and the purpose for which they are to be used, now, therefore, be it

"Resolved, that the amount of said general mortgage bonds of this company now required to be certified and issued is $110,000 or 110 bonds of a thousand dollars each, and that the purpose for which the same are to be used, is the acquisition by this company of the railroad and routes and other property and franchises of the Asbury Park & Belmar Street Railway Company, recently sold under foreclosure and now about to be purchased by this company."

On the same day, the president and treasurer of the defendant company certified to the complainant that the $110,000 of bonds

"Have been disposed of by said railroad company for the purpose of acquiring as an addition to and extension of its railroad, the railroad and routes and other property and franchises heretofore owned and operated by the Asbury Park & Belmar Street Railroad Company, and recently sold under foreclosure proceedings, the same being now about to be acquired by the said Atlantic Coast Electric Railroad Company."

For the purposes set forth in this certificate, the complainant, the Guaranty Trust Company of New York, certified, and on March 29, 1898, delivered, 110 bonds which were used for acquiring the "railroad and other property and franchises" of the "Asbury Park and Belmar Street Railway Company * * * as an addition to and extension of" the railroad of the defendant company. The remaining $40,000 of bonds held by the mortgagee, the complainant company, were, in December, 1899, upon a similar requisition of the defendant company, and similar certificate of the purpose for which the bonds were to be used, delivered by the complainant to the defendant company. These bonds, as before stated, were used for the purpose of acquiring and constructing an extension of the defendant's line from the southern terminus of the line then recently acquired from the reorganization committee of the Asbury Park & Belmar Street Railway Company. After the purchase of the railway of the last-named company by the defendant, to wit, on

April 20, 1898, the president of the defendant company, at a meeting of its board of directors, stated

"That counsel thought it might be advisable, in taking over the Asbury Park & Belmar property, to incorporate a separate company to which the deed held by the reorganization committee shall be transferred, and this company own all of the equity in the property over and above a $50,000 purchase-money mortgage as provided for by resolutions heretofore adopted. Mr. Kroehl then offered the following resolutions, which were duly seconded and unanimously adopted, as follows:

"Resolved, that in the event of counsel finally deciding it to be advisable to take over the Asbury Park & Belmar property heretofore purchased by this company through the ownership of stock in a new corporation to be created for that purpose, the proper officers of this company are hereby authorized and directed to secure the incorporation of such company, and in all other respects to pursue the method proposed by counsel, provided that this company shall own the entire equity in the property subject only to a purchase-money mortgage of $50,000, and be it further

"Resolved, that this company guarantee the payment of principal and interest of bonds to be issued by such new corporation to the amount of $50,000 in gold coin, and be it further

"Resolved, that the proper officers of this company are hereby authorized and directed to sign upon each of such bonds a proper guaranty to that effect, on behalf of this company."

At a meeting of the stockholders of the defendant company, held on the same day, April 20th, the following resolution of ratification was adopted:

"Resolved that the action of the board of directors, in the matter of acquiring from Messrs. Acton C. Hartshorne and G. B. M. Harvey the property rights and franchises of the Asbury Park & Belmar Street Railway Company, as set forth in their resolutions adopted at their meetings of March 29, 1898, and April 20, 1898, be in all things ratified, approved and confirmed."

Accordingly, some time before May 27, 1898, a new corporation was organized under the name of the Asbury Park & Seagirt Railway Company, for the purpose of taking title to the property rights and franchises of the Asbury Park & Belmar Street Railway Company. This new corporation took the title, executed the purchase-money mortgage for $50,000, and all its capital stock was delivered to the defendant company. On August 27, 1898, a lease was executed to the defendant company by this new company, of all its property, for a term of 99 years from September 1, 1898.

The situation, then, was this: The property and franchises of the Asbury Park & Belmar Street Railway Company had been purchased by the defendant company, and paid for by it with $110,000 of its bonds issued for that purpose by the complainant company, mortgagee and trustee for the holders of said bonds, in the manner above described. In addition, there was to be given, as the remaining part of the consideration, a purchase-money mortgage for $50,000, to secure bonds of the defendant company for that amount. The whole consideration, therefore, was paid by the defendant company and the title acquired through the instrumentality of a new corporation created for the purpose, all of whose stock was issued to and owned by the defendant company. When this new company took the title, the bonds last referred to were issued in its

name, and the mortgage to secure the same executed by it, but the defendant company guarantied the said bonds, principal and interest, pursuant to a resolution of its directors and another resolution of its stockholders, authorizing the same to be done; and in the same resolution, it was expressly declared that the whole equity over and above said mortgage, was retained by said company. The defendant company further covenanted to pay the taxes, assessments, license fees and charges imposed on the new corporation, or on the demised property, and an annual rental of $6,000, which, of course, would come back to the defendant company as the owner of all the stock of the new corporation. The new company was incorporated by the name of the Asbury Park & Seagirt Railway Company. To adopt the language of the learned judge of the court below,

"Equity regards the substance of a transaction and not its mere form. In equity, the defendant company must be regarded as the purchaser of the property transferred by the reorganization committee to the Asbury Park & Seagirt Railway Company. The latter company is a corporation practically in name only. It has no assets, and all its liabilities have been assumed by the defendant company. It was created merely to subserve the interests of the defendant company, and with the express understanding that the defendant company should own the entire equity in the property of the new corporation, over and above the purchase-money mortgage of $50,000. The proofs show that the railroad of the new corporation forms a continuation of the roads of the defendant company and the Seashore Electric Railway Company, and that it has been operated by the defendant company as a part of its railway system and in connection with the defendant company's property specifically described in the mortgage given by it."

The learned judge then states his own conclusion, as follows:

"It is clear, therefore, that the lien of the complainant's mortgage extends to and embraces both the capital stock of, and the rights acquired under the lease from, the Asbury Park & Seagirt Railway Company."

In so far as all the stock of this company, and the rights acquired under the lease therefrom, can be held to represent the whole interest and all the rights of the defendant company, in and to the property purchased as aforesaid from the Belmar Company, we agree with the conclusion reached by the court below. As has been shown, there is clearly disclosed in the resolution of the board of directors of the defendant company, passed October 7, 1896, providing for the form of bonds intended to be secured by the mortgage, and also in the mortgage itself, by its recital in full of the said form of bonds, an intention that the said mortgage should cover all after-acquired property of the defendant company, and especially such property as should be acquired by the bonds issued for that purpose by the complainant company, as mortgagee and trustee, under the safeguards of certification and notice, so carefully provided for in the mortgage itself. In view of this intention, so clearly expressed in the instrument itself, the conveyance clauses of the mortgage can, without difficulty, be interpreted, and indeed can only justly and properly be interpreted, to cover all rights, franchises or property thereafter acquired by the defendant company

appurtenant to or in connection with the line of railroad controlled and operated by it. To quote again, the mortgage conveys

"All and every franchise, right, privilege and easement of whatsoever kind or nature, now or hereafter at any time or howsoever owned acquired, possessed, enjoyed, or exercised by the railroad company * * * which ' are or may be connected with or appurtenant to the above described and hereby mortgaged railroad routes, * * * and real and personal property, franchises and premises, or any part thereof, now or hereafter belonging or in anywise appertaining, * * * and also all the estate, right, title, interest, property, possession, claim and demand whatsoever, as well in law as in equity, of the railroad company, in and to the same and each and every part and parcel thereof, with the appurtenances."

As shown in the opinion of the court below, all beneficial interest and ownership in the franchises and property of the Belmar Company, were purchased by and resided in the defendant company, the bare legal title being held by the Asbury Park & Seagirt Railroad Company, as trustee, for the benefit and purposes of the defendant company, which had paid the entire purchase price, and which remained the real equitable owner. The mortgage of July 1, 1896, both expressly and impliedly, covered equitable interests in after-acquired property appurtenant to or connected with the line of railroad controlled or operated by it. As soon as this equitable interest and ownership in the Belmar property was acquired, as hereinbefore described, by the defendant company, the lien of its mortgage attached itself thereto and remained upon it, both before, and after the legal title had been placed in the Asbury Park & Seagirt Company. Toledo, Delphos, etc., Railroad v. Hamilton, 134 U. S. 296, 10 Sup. Ct. 546, 33 L. Ed. 905; Central Trust Co. v. Kneeland, 138 U. S. 414, 11 Sup. Ct. 357, 34 L. Ed. 1014; Bear Lake Irrigation Co. v. Garland, 164 U. S. 1, 15, 17 Sup. Ct. 7, 41 L. Ed. 327. To hold that this were not so, would be to work a fraud upon the holders of these bonds, who were notified in the bonds themselves, and the declaration is recited in the mortgage, that they were secured by a mortgage conveying to the trustee (the complainant company) "all the certain railroad and other property, real and personal, and franchises of said railroad company, whether now owned or hereafter acquired by it." And not only were the holders of these bonds and all other creditors so notified, but, in an especial manner was the complainant company, the trustee for these bondholders, so notified by this language in the bonds that itself had issued, and in the mortgage that it held in trust to secure the same. Moreover, this complainant company, as trustee, was in an especial manner notified, by certificates made to it by the defendant company (hereinbefore recited) that 110 of these bonds were used in the purchase of this very line, the legal title of which is now held by the Asbury Park & Seagirt Railroad Company.

Such being the situation, on November 11, 1898, the president of the defendant company borrowed, on behalf of the company, from the complainant, the Guaranty Trust Company, mortgagee and trustee as aforesaid, the sum of $100,000, and executed and delivered to the said trust company a note therefor, and deposited with said company, as collateral security for the note, all the shares of

the capital stock of the Asbury Park & Seagirt Company. The transaction was approved by the board of directors on November 18, 1898, and the note and the collateral security have since been and still remain in the possession of the said trust company, the note being unpaid.

As we have seen, the court below, although holding that the real beneficial ownership of and in the franchises and property of the Belmar Company, had been acquired in the manner hereinbefore stated, as an addition to and extension of the line of the said defendant company, and that in consequence, this equitable right and ownership, as well as the legal title in the capital stock of the said Seagirt Company, came under the lien of the mortgage in suit, yet held that the complainant company, by its holding the pledge of all of said stock, under the circumstances as disclosed in this record, had, in its individual capacity, a superior equity to that of the mortgage given to it and held in trust for the bondholders. The learned judge of the Circuit Court thus states his reasons for this conclusion:

"The mortgage does not, in express terms, cover the capital stock. It is held to do so, as between the mortgagor and mortgagee, because the mortgagor company is in equity the owner of the property, the mere naked legal title to which is vested in the Asbury Park & Seagirt Railway Company, and because the only way by which the lien of the mortgage upon that equitable ownership can be enforced is by substituting for the railroad property itself that which fully represents it, namely, the capital stock of and the lease made by the new corporation. But, after the stock had been delivered to the defendant company, it deposited the stock with the complainant, in its individual capacity, as collateral security for the payment of a loan of $100,-000. This was on November 11, 1898. The complainant, on March 29th preceding, had delivered to the defendant company mortgage bonds to the amount of $110,000, to be used in the purchase of the property formerly of the Asbury Park & Belmar Street Railway Company. There is no evidence showing, or tending to show, that the complainant at any time before November 11th, received notice, or had any knowledge, that the defendant company had changed its purpose from that declared on March 29th, or that the property of the Asbury Park & Seagirt Railway Company was the same as that formerly owned by the Asbury Park & Belmar Street Railway Company. Neither does it appear that the complainant, before November 11th, had received any information sufficient to put it upon inquiry as to the disposition made of the $110,000 of bonds, or as to the means by which the stock of the new corporation was acquired. The stock was evidently accepted as collateral security by the complainant in good faith, and a decree that the lien of the mortgage is superior to its rights would be inequitable."

In this, we cannot agree. We do not think that the only way by which the lien of the mortgage upon this equitable ownership of the defendant company "can be enforced is by substituting for the railroad property itself that which fully represents it, namely, the capital stock of and the lease made by the new corporation." This ignores altogether the lien of the mortgage upon the equitable ownership itself. The capital stock held by the defendant company and thus pledged, represented the bare legal title of the property, whose full and entire beneficial ownership prior to the conveyance of the said legal title to the Seagirt Company, was in the defendant company, and came, as we have seen, under the lien of the mort-

gage. On the transfer of the bare legal title to the Seagirt Company, this equitable interest in the property remained subject to the lien of the mortgage, and those who held certificates for any or all of the capital stock held subject to such lien. The ownership of any aliquot part, or of all the capital stock of a corporation, confers certain well-understood and legally defined rights upon the owners thereof, such as the right under certain circumstances to dividends, the right to manage the corporation through its agents or boards of directors, etc. But the corporate entity is entirely separate and distinct from the ownership of capital stock, or from the whole body of stockholders. It is this corporate entity that transacts business, contracts obligations, and is subject to liabilities, legal and equitable. None of these liabilities can be affected or changed by any transfer of a part or of all of the stock. No question of notice to the transferee as to such liabilities is material to be considered. One who has a just claim, legal or equitable, against the corporation, is not concerned as to the ownership of the stock, whether it be in many or in few hands, or as to what notice or knowledge such stockholders, whether they be many or few, may have as to the existence of these liabilities. Important equities may arise between the transferror of stock and the transferee, but this cannot affect the existing liabilities, legal or equitable, of the corporation itself. In the case before us, the defendant company, as the owner of all the capital stock of the Seagirt Company, may be estopped to assert a legal or equitable right in itself, as against its pledgee of said stock. The controversy here, however, is not, in this respect, between the defendant company and the pledgee of this stock. It is between the pledgee of this stock and the creditors of the defendant company, who hold, by reason of the mortgage in suit, a lien upon the whole beneficial and equitable ownership of the defendant company in the line of railway acquired by it in the manner above described. If the defendant company had sold a portion of this stock, surely the lien of this mortgage so held in trust for the bondholders, would not have been measurably misplaced by reason of lack of notice to the transferee of the stock, and it is difficult to understand how a pledgee of such stock can be in any different or better position than such a purchaser.

This equitable ownership, being the real and beneficial ownership, and subject to the lien of the mortgage in suit, may be sold under the foreclosure decree, and inasmuch as the Seagirt Company holds the mere naked legal title in trust for the equitable owner, it may be a question whether, as a passive trust, it will not be considered as executed, and the legal title thus pass with the equitable; or it may be a matter for consideration, as to whether any, or what, further proceedings may be necessary to perfect and protect the title of the purchaser. However this may be, no rights were conferred by the pledge of the stock of the Seagirt Company, which were superior to, or could interfere with, the mortgage lien subsisting upon this plenary equitable title for the benefit of the bondholders under the mortgage.

If, however, the individual title of the complainant company to the property interests here claimed for the benefit of the bondholders under the mortgage lien, depended upon its having received the said stock in pledge without notice of said lien, we still think that the complainant was legally affected with such notice. The contention is made in its behalf, and approved by the court below, that inasmuch as the bonds issued by the complainant company and trustee, were upon certificates and requests that related to the purchase of the property and franchises of the Seagirt & Belmar Railway, and no specific notice was given to the said complainant company and trustee, that the title was to be placed for any purpose, in the new corporation, called the Asbury Park & Seagirt Railway Company, it received the stock of the latter company in pledge for its independent loan, free from the equitable title in the defendant company, now claimed for the benefit of said bondholders under the lien of the mortgage. However this might have been in the case of some other and indifferent pledgee, this contention overlooks the fiduciary relation borne by the complainant company to the parties in this litigation. The complainant company was mortgagee in trust for bondholders, under a mortgage which conveyed to it, for the security of said bondholders, the after-acquired property of the defendant company in what was formerly the Asbury Park & Belmar Railway. The court below has decided, and this court affirms its decision in that respect, that the lien of this mortgage attached to the equitable title of the defendant company, as hereinbefore described. Was not the trustee and mortgagee, therefore, bound to know what the mortgage to itself actually covered? What the court has finally said the mortgage covered by its terms, must be taken in legal contemplation to have been cognizable to the mortgagee and trustee from the beginning. It is admitted that the 110 bonds last issued by it, were for the certified purpose of purchasing the very property with which we are here concerned,— that is, the property of the Asbury Park & Belmar Railway.

But it is said on behalf of complainant, that when all the stock of the Asbury Park & Seagirt Company was pledged to it, it was not notified, nor by anything in the transaction was it put upon inquiry as to the fact that the railway franchise and property, the legal title of which was in this latter company, was the very same property that had been purchased by the defendant company with the bonds issued by it for that purpose. But was there indeed no duty resting upon this trustee and mortgagee, in the interest of its cestuis que trustent, to inquire whether a property embraced within the line of the railway covered by the mortgage already held by it, was not covered by the lien of that mortgage? To quote from the bondholders' brief:

"The Guaranty Trust Company knew that one hundred and ten bonds had been delivered by it to purchase additional railroad property, and the fact that the Atlantic Coast Electric Company was in possession of this railroad, operating and using the same, should have put it upon notice, that the railroad of the Asbury Park & Seagirt Railroad Company came under the lien of the mortgage which had been executed to the Guaranty Trust Company."

Columbus, S. & H. R. Co.'s Appeal, 109 Fed. 177, 48 C. C. A. 275, 304.

We think a duty did rest upon this trustee, and that when all the stock of a railway is pledged to it, it must be presumed to know, what it is inconceivable the owner of all the stock of a railroad company should not know, viz., the particular railway represented by such stock. So knowing, this complainant company must be taken to have been aware of the identity of the property of which the Asbury Park & Seagirt Railway had legal title, with that of the Asbury Park & Belmar Railway, purchased with bonds issued by it for that purpose. No special notice under these circumstances was necessary to inform the complainant company of the situation. If this were otherwise, bondholders would be deprived measurably of the protection of faithful guardianship of their interests by the trustee appointed for that purpose. We do not think a court of equity should so view the facts and circumstances of this case, as to make the security of the bondholders depend upon whether notice has or has not been given to the mortgagee, who holds the mortgage as trustee for their benefit. It will be observed that there is nowhere in the pleadings or in the proof, a specific denial of actual knowledge of the transaction, by which the legal title to the property in question came to be in this new corporation, called the Asbury Park & Seagirt Railway Company. If a real equity is to be claimed by reason of the want of such knowledge, prima facie proof at least should have been made by the trustee who sets it up. A court of equity cannot countenance such a discrimination, as is sought to be made in this case, by a trustee, between property of the mortgagor which it holds in trust, and property of the same mortgagor which it claims to hold in its individual capacity. To do so, would be a serious relaxation of the rules, which have for long and uniformly governed the administration of trusts, and measured the responsibility of trustees.

The decree below, therefore, is amended in section 6 of paragraph second, clauses (1)–(c), by adding to the words, "the lease from the Asbury Park & Seagirt Railroad Company, dated August 7, 1898," the following: "Also all of the capital stock of the said last-mentioned company issued to and owned by the defendant company, and all the right, title and interest, legal and equitable, of the defendant company in and to the property and franchises of the said Asbury Park & Seagirt Railroad Company, as were acquired by said defendant company subsequent to the date of said mortgage or deed of trust"; and by striking out paragraph third of said decree, and out of paragraph eighteenth the following: "except, however, in or to the said one thousand shares of the capital stock of the Asbury Park & Seagirt Railroad Company, which the complainant shall not be required to convey, transfer and release until and unless its aforesaid individual equitable lien thereon shall have been satisfied in full"; and by striking out from the nineteenth paragraph thereof the following: "except, however, said one thousand (1,000) shares of the capital stock of the Asbury Park & Seagirt Railroad

Company, the certificates of which the said receiver is hereby direct-
ed to deliver to the said Guaranty Trust Company of New York,
properly indorsed for transfer."

In other respects, the said decree is affirmed.