### In re JACKSONVILLE GAS CO. et al.
No. 483.

District Court, S. D. Florida, Jacksonville Division.
Sept. 22, 1942.

Chester T. Lane, Gen. Counsel, of Washington, D. C., Homer Kripke, Sp. Counsel, Myron S. Isaacs, and David Ferber, all of Philadelphia, Pa., for Securities & Exchange Commission.

Humes, Buck, Smith & Stowell (Albridge C. Smith) of New York City, and Elliott Adams, of Jacksonville, Fla., for Gas Companies.

Davis, Polk, Wardwell, Gardiner & Reed (Edgar G. Crossman) of New York City, for debenture trustee.

Pam, Hurd & Reichmann, of Chicago, Ill., for mortgage trustees.

Lawrence E. Fleischman, of Chicago, Ill., Charles Cook Howell, of Jacksonville, Fla., and Joseph A. Varon, of Hollywood, Fla., for certain debenture holders.

STRUM, District Judge.

This is an application by the Securities & Exchange Commission, at the request of Jacksonville Gas Company, for an order pursuant to § 11(e) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79k (e), to enforce and carry out a plan of reorganization heretofore promulgated by the Commission to eliminate existing inequity and unfairness in the present distribution of voting power amongst the security holders of said company. The Commission has found said plan to be fair and equitable, and necessary to effectuate the provisions of § 11(b) of the Act.

Jacksonville Gas Company is an operating utility, serving Jacksonville and vicinity. It is not a holding company. 50% of its voting capital stock is owned by American Gas & Power Company, a registered public utility holding company. The Jacksonville Gas Company is therefore a subsidiary of American Gas & Power Company. § 2(a) (8) (A), 15 U.S.C.A. § 79b(a) (8) (A).

As of December 31, 1941, the company's total long term debt aggregated $5,498,231;[1] there was outstanding capital stock aggregating $50,196 par value; and the company carried a book surplus (capital and earnings) of $613,130. This produces a total capitalization and book surplus of $6,161,557.

As of December 31, 1941, the book value of plant and equipment was $6,207,250, but

[1] Made up as follows: first mortgage bonds, principal, $3,490,000; accrued conditional interest thereon, $441,925; income debentures, $1,404,000; income notes, $162,306.

that figure far exceeds actual value. The present value of the company's assets ($2,-625,000), hereinafter discussed, demonstrates that in fact its fixed liabilities (exclusive of capital stock) greatly exceed the fair value of its assets. Its present debt structure, originally created on the basis of a greatly inflated plant valuation, now imposes interest requirements far in excess of the company's earning power. In 1935 the company underwent a 77B reorganization, 11 U.S.C.A. § 207, the primary result of which was to reduce the fixed interest rate on its then outstanding bonds, and to make part of its interest requirements upon said bonds, and all the interest upon its debentures and income notes, conditional upon earnings. Principal of these obligations was not reduced. Since that time the company's earnings[2] have been sufficient to meet fixed interest charges on the bonds, but relatively little has been available for conditional interest after providing for sinking fund requirements and essential plant extensions in accordance with the 1935 reorganization plan. Fixed interest on bonds at 3% has been paid to December 31, 1941, but only $90,000 (approximately) has been paid on, or available for, conditional interest since 1935.[3] No interest has been paid upon debentures or income notes, and of course there have been no stock dividends.

■ The present capital stock obviously has no equity in the company. Yet the holders of this stock now exercise the entire voting power—an obvious inequity within the meaning of § 11(b) (2) of the Act. The voting power should be vested in the creditors, who are now the real owners.

Certain debenture holders contend that since the Jacksonville Gas Company is an operating utility, not a holding company, the Commission has no power to alter its corporate structure as proposed in the plan under consideration, involving as it does a comprehensive internal reorganization, affecting all classes of security holders.

Section 1(b) (1) of the Act, 15 U.S.C.A. § 79a(b) (1), declares that the national public interest, and the interests of investors in securities of holding companies "and their subsidiary companies," are or may be adversely affected when "such securities are issued upon the basis of fictitious or unsound asset values having no fair relation to the sums invested in or the earning capacity of the properties," and when securities are issued "by a subsidiary public-utility company under circumstances which subject such company to the burden of supporting an overcapitalized structure * * *." Section 1(c) declares it to be the policy of the Act, in accordance with which all the provisions of the Act shall be interpreted, "to meet the problems and eliminate the evils" above stated.

Section 11(a) of the Act makes it a duty of the Commission to examine the corporate structure "of every registered holding company *and subsidiary company thereof*" (italics supplied) to determine "the extent to which the corporate structure of such holding-company system *and the companies* therein may be simplified * * * [and] voting power fairly and equitably distributed among the holders of securities thereof, * * * appropriate to the operations of an integrated public-utility system." This language "registered holding company, and each subsidiary company thereof" follows through several provisions of § 11(b), and finally in § 11(b) (2) is found this provision: "Except for the purpose of fairly and equitably distributing voting power among the security holders of such company, nothing in this paragraph shall authorize the Commission to require any change in the corporate structure or existence of any company which is not a holding company, or of any company whose principal business is that of a public-utility company."

■ When the Act says that the Commission is not authorized to require any change in the corporate structure of an operating utility, "except for the purpose of fairly and equitably distributing voting power among the security holders of such company," it clearly implies that the Commission may require such change if it be for that purpose. Else, why was the quoted exception included in the Act? If Con-

---

2 The company's *gross income*, comprised of *net* operating revenue, plus total other income, but *before* Federal income taxes, has been:

| | |
|---|---|
| 1936—$199,430 | 1939—$191,514 |
| 1937—$195,417 | 1940—$191,465 |
| 1938—$190,351 | 1941—$178,767 |

Average for 6 years, ending 1941, $191,145.

3 As of April 30, 1942, the company owed, on first mortgage bonds, fixed interest of $43,625, and conditional cumulative interest of approximately $465,263.

gress intended to withhold such power, that intent would have been evidenced beyond debate by simply omitting the quoted exception. Its inclusion in the Act must be given appropriate significance and weight.

■ The Act contemplates that ordinarily the fair and equitable distribution of voting power in a holding company system may be accomplished by adjustments in the corporate structure of the holding companies themselves, rather than in the operating companies. But where, as here, intrinsic inequity in the distribution of voting power is found in the structure of an operating company, and the purpose of a proposed plan is to remedy that inequity, the above quoted language, when given its proper perspective in the whole Act, authorizes the Commission to appropriately readjust the corporate structure of that particular operating utility, even though a comprehensive internal reorganization, affecting all classes of security holders, is necessary to accomplish that end.

■ That this is so becomes clearly apparent here. Under its present corporate structure, the company's voting power is inequitably distributed because exercised by capital stock having no equity in the company. This, in turn, is due to the fact that the company is now burdened with excessive fixed obligations, thus subjecting the company "to the burden of supporting an overcapitalized structure," defined in § 1 (b) (1) of the Act as one of the evils which may be eliminated thereunder. It is obvious that fixed obligations must be reduced in order to inject value into the stock. It therefore seems not only desirable, but essential, that both problems be solved by one comprehensive plan of reorganization which includes a reduction in fixed obligations, which will in turn restore value to the capital stock. Otherwise, the voting power would still be exercised by stock which represents no equity in the company. To merely distribute the old stock among present bond, debenture and note holders would not effect an adequate cure, as this old stock might pass on to other ownership, thus perpetuating the present inequity of distribution.

Moreover, enforcement of the proposed plan will deprive the holding company, American Gas & Power Company, of its present control of Jacksonville Gas Company, and thus the ultimate effect of the proposed plan will extend into and affect the holding company itself.

The plan contemplates that a new corporation be formed, to acquire all the assets of the present company and to assume all its obligations except the presently outstanding first mortgage bonds, income debentures, and income notes. As consideration for the assets so acquired, the new corporation will issue to the present company new first mortgage 5% bonds in the principal amount of $1,745,000 (50% of the present principal) plus 36,448 shares of common stock (par value $25.00 per share) carrying the voting power of the new corporation. These new securities would be distributed by the present company to its security holders, in satisfaction of their present claim against the old company, as follows:

All the new bonds and 34,900 shares (95.76%) of the new stock to the present first mortgage bondholders at the rate of $500 principal amount of new bonds, and 10 shares of new stock, plus $12.50 in cash,[4] for each principal amount of old first mortgage bonds. The remaining 1,548 shares (4.24%) of the new stock would be distributed to the present holders of debentures and income notes at the rate of one share of stock for each $1,000 principal amount of present debentures and notes. Nothing to the old stockholders, who would be eliminated. Upon thus distributing the new securities, the old company would surrender its charter and be dissolved.

Thus the present first mortgage bondholders, as a class, and the present debenture and note holders, as a class, would own the new stock in the proportion of 95.76% to 4.24%, respectively. First mortgage bondholders receive 50% of the principal of their present bonds in new bonds, plus $12.50 in cash per $1,000 of old bonds. Present debentures and income notes, as such, are eliminated, and new stock substituted therefor as above stated.[5]

---

[4] The cash payment covers fixed interest on old bonds accrued and unpaid up to April 30, 1942.

[5] Present debentures and income notes are unsecured. Old first mortgage bonds are secured by a first lien upon all property of the company, real, personal and mixed, including after-acquired property, and by a purported lien upon the income, revenues, receipts, gas rents, contracts, leases, claims, accounts, choses in action, and contract rights of the com-

The plan seems satisfactory to the present first mortgage bondholders. Principal opposition comes from debenture and income note holders, and the Trustees of the former, who assert (a) that the Commission erred in its valuation of the company's assets, and also in adopting 8% as a basis for capitalization of earning power; (b) that certain assets determined by the Commission to be subject to the first mortgage are really "free" assets, in which debenture and note holders should participate; (c) that certain customer deposits treated by the Commission as a preferred claim against free assets, are not in fact such, but are subject to distribution as free assets; and (d) that debenture and note holder's ratio of participation in "free" assets has been improperly determined.

The Commission explored four approaches to the question of value:

First: Book value, which was given little weight because this value was obviously inflated and the reserve account for retirements and replacements entirely inadequate.

Second: Reproduction cost, a consideration of which led to an indicated value of $3,534,960, after depreciation.

Third: Original cost, less depreciation, which the Commission estimated to be $2,961,171. Cf. Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. ——.

■ Fourth: Capitalization of earning power, now a recognized method of determining value for the purpose of allocating new securities upon reorganization. Consolidated Rock Products v. Du Bois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982. In its ultimate determination of value, the Commission relied primarily upon this method, adopting $210,000 as prospective gross annual income of the new company, before Federal taxes, and upon this income, capitalized at 8%, reached a valuation of $2,625,000. This rate of return (8%) will actually yield between 6.6% and 5.9% net, *after* Federal taxes, depending upon the outcome of pending tax bills.

■ The Court concurs with the Commission in its basis of computation and in its determination of value. A prospective gross income (net operating revenue, plus other income) of $210,000, before Federal taxes, seems prudent in the circumstances, making due allowance for prospective increased patronage. (See Note 2 supra). A return of between 6.6% and 5.9%, after all taxes, for public utilities of this character, is a fair return under present conditions, based upon current normal market capitalization of earnings. A smaller prospective return on public utility stock of this character, with its well known hazards, would unduly penalize the investor. The Court approves this valuation of $2,625,000, which is about $300,000 less than depreciated original cost, and deems it to adequately cover allowances for intangible values to the extent here merited.

The Commission determined the following to be free assets, not subject to the mortgage lien:

| | |
|---|---|
| Cash, special deposits & accounts receivable (exclusive of customer's meter deposits) | $ 96,471 |
| Material & supplies (appliances for resale, Butane gas, production material, gasoline, oil, etc.) | $ 76,300 |
| Prepayments by Company | $ 4,175 |
| Gross Free Assets | $176,946. |

The Commission held the following to be subject to the mortgage, the debenture and note holders contending that they should have been included as free assets:

| | |
|---|---|
| Materials & supplies (residuals—tar; pipe & fittings; repair materials) | $49,535 |
| Investment securities (certificate of indebtedness of American Gas & Power Company, face value, $63,534, and stock in Public Utility Management Company, wholly owned by American Gas & Power Company, face value, $1900) estimated *actual* value of both | $33,667 |
| | $83,203. |

■ Which are free assets, and which are subject to the mortgage, is to be determined by the laws of Florida where the property is situate. Thompson v. Fairbanks, 196 U.S. 516, 25 S.Ct. 306, 49 L.Ed. 577; Pintsch Compressing Co. v. Buffalo Gas Co., 2 Cir., 280 F. 830. Cf. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487.

■ In Florida, an after-acquired property clause in a general mortgage is

---

pany. The new first mortgage bondholders would be secured by a new first lien on all the property of the new company capable of being thus mortgaged.

enforceable, and is superior to a subsequent chattel mortgage on the same personalty. Hyman v. City Trust Co., 99 Fla. 1202, 128 So. 611; Central Farmers' Trust Co. v. McCampbell Furniture Stores, 127 Fla. 721, 128 Fla. 60, 174 So. 748. Under the above authorities, the Commission made a correct segregation of assets. Its findings are consistent with Benedict v. Ratner, 268 U.S. 353, 45 S.Ct. 566, 69 L.Ed. 991, which holds a mortgage lien ineffective as to accounts receivable. These have here been classified as "free" assets. The above mentioned certificate of indebtedness and Public Utilities Management Company stock are not receivables, but are properties capable of being mortgaged, and are clearly covered by the comprehensive granting clause of the mortgage, as held by the Commission. The doctrine of Benedict v. Ratner does not extend to these. They are in no sense current assets. United States Mortgage Co. v. Chicago & A. R. Co., 7 Cir., 40 F.2d 386, 391; Guaranty Trust Co. v. Atlantic Coast E. R. Co., 3 Cir., 138 F. 517.

The debenture holders contend that franchises and good will or "going concern" value should be included in the free assets. Aside from the fact that these are specifically covered by the mortgage, these items can have no existence, nor value, when severed from the fixed plant property.

Also untenable is the contention that a bank loan to the Company in December, 1941, and repaid in March, 1942, constitutes a free asset. This bank loan was secured in ordinary course of business during a "lean" period, with which to pay current taxes, which were a claim superior to those of unsecured creditors. Prepayment of the loan is not a recoverable preferential payment within the meaning of § 612.45, Fla.Stats.1941, § 6569, C.G.L.1927.

From the gross free assets, aggregating $176,946, the Commission deducted the following (aggregating $129,733) as preferred claims against those assets, thus producing a net free asset value of $47,213, to which debenture holders object:

| | |
|---|---|
| Current accounts payable for general operating expenses | $ 14,400 |
| Tax claims (exclusive of real estate taxes and contingent Federal income tax liability) | $ 15,668 |
| Customer's deposits for meter service, extension of mains, etc., | $ 99,665 |
| Total | $129,733. |

These deductions are justified. Current accounts payable for gas making materials, labor, and ordinary expense necessary to a continued operation of the public service functions of the company for a reasonable period (usually six months) are entitled to preferential payment out of free assets. Pintsch Compressing v. Buffalo Gas Co., supra; Crane Co. v. Fidelity Trust Co., 9 Cir., 238 F. 693; Pennsylvania Steel Co. v. New York City Ry. Co., 2 Cir., 216 F. 458, 471. The mortgaged property can be subjected to such claims only to the extent that income has been diverted from their payment to the benefit of mortgaged creditors, which does not here appear. Guaranty Trust Co. v. Albia Coal Co., 8 Cir., 36 F.2d 34.

The Commission made no deduction for local real estate taxes, which are a charge against the mortgaged property. Federal income taxes, and other taxes enforceable in personam, are entitled to priority over unsecured claims, even if also enforceable against mortgaged assets. First National Bank v. Proctor, 1 Cir., 40 F.2d 841; Fidelity & Casualty Co. v. Massachusetts Mutual Life Ins. Co., 4 Cir., 74 F.2d 881. Cf. Ormsbee v. United States, D.C., 23 F.2d 926. The total sum of these deductions was quite fair to secured creditors, as it does not include an additional $40,269 income tax liability asserted against the company, which liability has now been settled by payment of approximately $29,-000, according to counsel's statement at the argument, though this is not formally in evidence. Nor does it include anything for expenses in this reorganization.

Pursuant to the company's requirements, its customers have made cash deposits for meter installations, extension of mains, etc., aggregating $99,665. These depositors are entitled to repayment thereof when service is discontinued, or at some other fixed time. While perhaps not in all respects a technical trust fund, these claims are clearly entitled to priority of payment out of free assets as against unsecured creditors.

As the value of the company's total assets ($2,625,000) is less than the amount of the company's secured debt, with accrued interest (approximately $4,007,713, as of May 31, 1942), debenture and note holders, as junior creditors, are entitled to participate in a distribution of assets only to the extent that these are "free" assets not subject to the mortgage lien. Case v. Los Angeles Lbr. Products Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110; Consolidated

Rock Products v. Du Bois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982.

The extent to which debenture and note holders, as junior creditors, should participate in the free assets, was thus determined by the Commission:

Total claim of bondholders, with accrued interest, fixed and conditional, as of May 31, 1942, $4,007,713  
*Less*  
Value of mortgage lien—(total value of all property, $2,625,-000, less net free assets of $47,-213) $2,577,787  
———————  
Deficiency claim of bondholders against free assets $1,429,926.[6]

As of May 31, 1942, the claims against free assets of unsecured creditors affected by the plan were:

Income debentures (principal) $1,404,000  
6% conditional interest from Jan. 1, 1942 to May 31, 1942 $ 35,100  
Income notes (principal only) $ 162,306  
———————  
Total junior claims $1,601,406.

On this basis, the relative participation of these two groups in the $47,213 of free assets would be:

$1,429,926 bondholders' deficiency, 47.2% or $22,285.  
$1,601,406 debentures and notes 52.8% or $24,928.

Accordingly, it appears that the debenture and note holders should appropriately participate in the equity of the new company, represented by the new stock. That participation is thus determined:

Total value of company's assets $2,625,000  
*Less*  
New bonds $1,745,000  
Cash to old bondholders $ 43,625 $1,788,625  
———————  
Value of equity represented by new common stock $ 836,375.

Debenture and note holders are therefore entitled to share in the new equity in the ratio of $24,928 to $836,375, or a trifle less than 3%. Nevertheless, for the purpose of avoiding fractional shares in the new corporate stock, these unsecured creditors are given a participation in the new stock equal to 4.24% of the new equity, or approximately $35,462, instead of the value of $24,-928 (approximately 3%), to which they are strictly entitled under the foregoing computation. Or, to employ another basis of computation, the value of free assets to which debenture and note holders are entitled on the basis of the above calculation, is 0.95% of the total value of the enterprise ($2,625,000), while the amount of new stock they will actually receive is equal to 1.35% of such value. Or if still another test is used: 52.8% of the $47,213 of free assets, to which debenture and note holders are strictly entitled, is $24,928. Yet they will actually receive a stock participation of $35,462, which is approximately 75% of the value of free assets. This advantage to the debenture and note holders is in a practical sense offset by the payment in cash to bondholders of fixed interest down to April 30, 1942.

The net result of the proposed plan is to revitalize the voting capital stock by reducing the presently excessive fixed obligations. This establishes a value for capital stock, and at the same time brings fixed charges within the range of the company's earning power. The new stock is distributed amongst the present bond, debenture and note holders, where it equitably belongs. As American Gas & Power Company owns none of the present bonds, debentures or notes, it will receive none of the new stock, and is thus deprived of its present control of Jacksonville Gas Company.

Eliminating hyper-technical considerations, and viewing the matter in a practical aspect, the Court, feeling that practical and substantial justice has been accorded all parties, approves the revised plan submitted by the Commission as fair, equitable, and appropriate to effect the provisions of § 11(b) of the Act.

Order of enforcement will issue.

—————

[6] If the mortgaged property were sold under foreclosure, it is by no means certain it would bring the full value of $2,-577,787. If it did not, the bondholders' deficiency claim would be increased.