## In re KINGS COUNTY LIGHTING CO.

Civ. No. 7609.

District Court, E. D. New York.

July 3, 1947.

City, of counsel), for individual preferred stockholders of Kings County Lighting Co.

Nathaniel L. Goldstein, Atty. Gen. of the State of New York (Samuel A. Hirshowitz, Asst. Atty. Gen., of counsel), for the Secretary of State of New York.

Unger & Pollack, of New York City, for committee for preferred stockholders of Long Island Lighting Co.

McLaughlin & Stern, of New York City, for Katherine S. Campbell and other holders of preferred stock of Nassau & Suffolk Lighting Co.

KENNEDY, District Judge.

*The Application, generally considered.*

The Securities and Exchange Commission applies for an order approving and enforcing an Amended Plan of Reorganization submitted by Kings County Lighting Company (herein called Kings) under the terms of the Public Utility Holding Company Act, Act of August 26, 1935, c. 687, title 1, sec. 1 et seq., 49 Stat. 838, 15 U.S. C.A. § 79 et seq.; herein sometimes called the "act" and sometimes "the statute." The precise statutory basis for the application is section 11(e) of the act.[1] The Long Island Lighting Company (herein called Long Island) is a holding company as defined by section 2(a) (7) of the act. Kings is a subsidiary of Long Island under section 2(a) (8) (A) of the act. Under the statute, section 11(b) (2), it was the duty of the Securities and Exchange Commission to require Kings to take whatever steps that commission found necessary to insure that the corporate structure did not unfairly or unequitably distribute the voting power among security holders.

The statute also authorizes any subsidiary company of a registered holding company (like Kings) voluntarily to submit a plan to the Securities and Exchange Commission, section 11(e), in order to accomplish the purpose of section 11(b) (2) of the act, among which are, as I have mentioned, the correction of corporate structure to eliminate unfair or inequitable distribution of voting power. It is an

Harry G. Slater, Chief Counsel, Public Utilities Division, of Philadelphia, Pa. (Solomon Freedman, of Philadelphia, Pa., and Alfred Hill, of Philadelphia, Pa., of counsel), for Securities and Exchange Commission.

Philip Halpern, of New York City, for Public Service Commission.

Charles G. Blakeslee, of New York City, for Kings County Lighting Co.

Levien, Singer & Neuberger, of New York City (Stuart Steinbrink, of New York

---

[1] Section 1 of the act has become 15 U.S.C.A. § 79a; section 2, 15 U.S.C.A. § 79b, and thereafter the section numbers are translated into letters of the alphabet. Thus section 11 is 15 U.S.C.A. § 79k.

amended plan, submitted by Kings under section 11(e) that is the subject of the application before me. Ordinarily, of course, the only question before me would be whether the proposed plan is fair and equitable, and calculated to accomplish the statutory purpose, section 11(e). However, as will appear, more than that is here for decision: the application itself has produced a jurisdictional controversy between the Public Service Commission of the State of New York and the federal Securities and Exchange Commission.

It should be unnecessary at this point to dwell at very great length on that amended·plan to revise the capitalization of Kings, although some brief reference ought now to be made to it. I say this because the area of controversy over the plan itself seems to me to be very narrow.

At present, the outstanding shares of common and preferred stock of Kings are as follows:

Preferred stock:
17,871 shares 7% Series B,
 par value $100....... $1,787,100.
1,129 shares 6% Series C,
 par value $100....... 112,900.
25,000 shares 5% Series D,
 par value $100....... 2,500,000.
Common stock:
50,000 shares without par
 value, having· a value
 for capital purpose of $2,000,000.
Total capital represented by
 outstanding stock ......... $6,400,000.

If the plan is approved and carried out, the capitalization of Kings will be as follows:

Preferred stock:
44,000 shares new 4% pre-
 ferred stock, par value
 $50 ................. $2,200,000.
New common stock:
440,000 shares without par
 value, having a value
 for capital purposes
 of ................ $2,200,000.
Total capital represented by
 outstanding stock ......... $4,400,000.

It will be observed that the net effect of these changes is to reduce the capital .of the company in the amount of $2,000,000. Out of this amount it is planned to return in cash to preferred stockholders $191,484, and with the remainder to create a capital surplus of $1,808,516, to be used solely for the purpose of making such adjustments in the company's books of account as may be directed by the Public Service Commission of the State of New York with respect to depreciation and other reserves. The plan is based upon the belief that this change, and others incidental to it, will bring the dividend requirements of the company into proper relation to earning power, and will effect a fair and equitable distribution of the voting power between the two classes of stock, a salient feature of the plan being that the present preferred stockholders will receive 396,000 shares (90%) of the new common stock, leaving only 44,000 shares (10%) in the hands of the present owners of the common stock of the company.[2] So far as the amended plan itself is concerned, it is clear that the controversy between the Securities and Exchange Commission, on the one hand, and the Public Service Commission of the State of New York, on the other, springs perhaps not exclusively, but largely from this proposed redistribution of the common stock.

### The Chronology of the Application.

I believe I can clarify the controversy to some extent by reviewing briefly here the history of the proceeding.

In 1936 the Securities and Exchange Commission granted the application of Long Island that it and its subsidiaries be exempt from the provisions of the statute (Long Island Lighting Company, 1 S.E.C. 345). In 1944 Long Island filed with the New York Public Service Commission a petition for reduction (and other changes) in its capital structure. The plan was opposed as unfair and inequitable by a Protective Committee for preferred stockholders. Under date of July 27, 1944, the Public Service Commission, after severely criticising the proposal of Long Island, pointed

---

[2] This was later modified to provide that the old common stockholders would receive 7½% of the new common stock.

out that it (the Commission) had power only to approve or disapprove, and none to compel the company to readjust its stock, or its voting rights, in accord with sound finance and equitable considerations. In November, 1944 the Stockholders' Protective Committee petitioned the Securities and Exchange Commission to revoke or modify the 1936 exemption order, and on November 10, 1944, a hearing was ordered by the Securities and Exchange Commission. Meanwhile, and on December 14, 1944, the Public Service Commission approved an amended proposal of Long Island by a vote of 3 to 2. The majority pointed out that the plan was deficient in some respects, but again said that the authority of the Public Service Commission was limited to approval or disapproval: the commission could not formulate a new plan nor require the petitioning company (Long Island) to make changes which might be thought desirable. Thereupon the Securities and Exchange Commission attempted to restrain Long Island against carrying out the plan. I denied the application for a temporary injunction. Securities and Exchange Commission v. Long Island Lighting Co., D.C., 1944, 59 F.Supp. 610. And this determination was upheld by the Circuit Court of Appeals for the Second Circuit, Judge Clark dissenting. Securities and Exchange Commission v. Long Island Lighting Co., 2 Cir., 1945, 148 F.2d 252. The Supreme Court granted certiorari, but later dismissed the proceeding as moot, Securities and Exchange Commission v. Long Island Lighting Co., 1945, 325 U.S. 833, 65 S.Ct. 1085 89 L.Ed 1961, because, in the meantime, the Securities and Exchange Commission had modified the exemption order theretofore granted Long Island, Long Island Lighting Company et al., Holding Company Act Release No. 5746; order of April 21, 1945. The modification order was predicated on findings, among others, that the preferred and common stocks of Long Island were distributed among holders in some 49 states and foreign countries. The Securities and Exchange Commission also found that in a period of 12 months the common and preferred shares of Long Island had been extensively traded on the New York Curb Exchange. Kings, the subsidiary of Long

Island here involved, at that time had listed on the New York Stock Exchange two series of bonds, and the preferred stock of Kings was traded through the New York Curb Exchange. Holders of the capital stock of Kings, as of January 15, 1947, are located in 28 states and in 3 foreign countries.

Kings filed its original plan for recapitalization on August 25, 1945. On February 5, 1946, the Public Service Commission of the State of New York adopted a memorandum setting forth 10 specific criticisms of the plan as filed. Kings thereupon amended its plan as of April 16, 1946, and filed that amended plan with the Public Service Commission of the State of New York on April 23, 1946, in an effort to comply with the criticisms theretofore made by the state commission. This amended plan (April 16, 1946) spoke throughout of balance sheets and other financial statements reflecting the condition of the company on April 30, 1946, the significance of which fact will be made clear at a later point.

On December 13, 1946, the Securities and Exchange Commission handed down findings and an opinion, indicating that it would approve Kings' amended plan only if it was further modified in four respects, namely: (a) by reduction of the proportion of new common stock to be issued to the present holders of common shares, (b) by amendment of the proposed certificate of incorporation to provide for cumulative voting in the election of directors by the holders of the new common stock, (c) by the elimination of the requirement for a vote of existing stockholders with respect to the plan, and (d) by a provision for the payment of fees and expenses in connection with the plan and the proceedings to carry it out.

On January 8, 1947, Kings filed a modification of its amended plan embodying the suggestions made by the Securities and Exchange Commission, and on January 9, 1947, the amended plan, as modified, was approved by the Securities and Exchange Commission. A district court hearing was noticed for February 24, 1947, for the purpose of determining whether the plan is fair and equitable, and, if so, whether an enforcement order should be granted.

In the meantime, the Public Service Commission of the State of New York had under consideration the amended plan. The return day of the district court hearing was, therefore, adjourned to March 24, 1947. Prior to that adjourned date, and on March 6, 1947, the Public Service Commission of the State of New York handed down a long memorandum and reached the conclusion (1) that none of the plans then before it should be approved, (2) that the pending application as a unit should be denied as inequitable, (3) that it supplied no basis on which it (the Commission) could make the findings required by the Public Service Law of the State of New York, and (4) that it is not in the public interest.

It is certain, as I have suggested, that one of the strongest objections on the part of the Public Service Commission of the State of New York to the proposal before it related to the allocation of new common stock to the holders of the old common stock. The amended plan had provided for a distribution of 10% of the new common stock to the old holders. (Long Island actually owns 97.736% of the common stock of Kings. However, from time to time hereafter I speak of Long Island as if it were the sole owner of the old common stock). The Securities and Exchange Commission on December 13, 1946, thought this proportion should be reduced to 7½%. But the Public Service Commission of the State of New York is of the opinion that none of the new common stock should go to the old holder, even though it (Long Island) was required, within the space of a year, to divest itself of its holdings of the new common stock. It will be readily appreciated that, in a case of this kind, it is always easy to over-simplify the issues, a result which I strongly wish to avoid. However, it is clear, to me at least, that the Securities and Exchange Commission believes that a redistribution of the common stock, under which Long Island receives 7½% of the total to be outstanding and retains that percentage for no more than a year, is fair and equitable; this the Public Service Commission of the State of New York vigorously denies. And the difference of opinion between the two commissions is very largely explained by the fact that the Securities and Exchange Commission has attempted to appraise the present Kings common stock holdings of Long Island on a potential earning basis, whereas the Public Service Commission of the State of New York believes any such basis unreliable, and any plan based upon that sort of distribution neither fair nor feasible, because, on an asset basis, the present common stock holdings (in Kings) of Long Island have no value at all. I may say in passing that certain groups of the preferred stockholders of Kings, who would be directly and adversely affected by an unfair allocation of the new common stock, take the position in briefs filed in this proceeding that an enforcement order should be granted, despite the objections of the Public Service Commission of the State of New York. But this fact is not controlling and, perhaps, not of any great significance. Primarily, the conflict is between two public agencies, each anxious, within the scope of its authority, to protect the public, and, in a controversy of that kind, the wishes of those immediately affected (i.e., the stockholders and the company) must necessarily be subordinated to other more important considerations.

### Should the Plan be Remanded?

I have tried to outline the factual setting out of which the application at bar, and the opposition to it, arose. The command of the particular portion of the act invoked by this proceeding, sec. 11(e), is that the court, if it approves the plan as "fair and equitable and as appropriate to effectuate the provisions" of the statute, may make an order for the purpose of carrying out the terms and provisions "of such plan".

The New York Public Service Commission, in its brief, emphasizes that my power is very limited: I can only approve or disapprove the ("such") plan before me (citing In re Laclede Gas Light Co., D.C. E.D.Mo.,E.D.,1944, 57 F.Supp. 997, 1002). The Public Service Commission places this strong emphasis upon the limited scope of the power of the District Court, because the plan in its original (August 25, 1945), as well as in its amended (April 16, 1946) form, sets forth the fact that among the steps to be taken in effectuating it is

the securing of the consent and approval of the Public Service Commission. In its findings and opinion (December 13, 19-16) the Securities and Exchange Commission did not suggest that the plan be modified by elimination of this requirement for approval by the state commission. Therefore, says the latter, the plan which I am asked to pass upon still contains this important feature, and it would be an idle gesture on the part of any court to approve it as it now exists, since it is obvious that the Public Service Commission will not give its approval: it has specifically withheld such approval (March 6, 1947). What I have said fairly summarizes, I think, the first two points of the brief submitted to me by the state commission. On the other hand, it is urged on behalf of the Securities and Exchange Commission that, even though the plan, both in its original and amended form, contemplates that the approval of the state commission is to be sought and secured, still this is not a vital feature of the plan, because, if it is, then the recapitalization of Kings is subject to the veto of the New York Public Service Commission. And the argument runs that this cannot be so, because the basic federal act is a specific overriding federal law (citing Phillips v. Securities and Exchange Commission, 2 Cir., 1946, 153 F.2d 27, certiorari denied, 1946, 328 U.S. 860, 66 S.Ct. 1350, 90 L.Ed. 1630; Application of Okin, 1946, 187 Misc. 697, 65 N.Y.S.2d 23.) Therefore, it is said, even if the underlying federal statutes seemed to require approval by state authority, this would merely operate as a suggestion to the federal agency, and not as a binding requirement (citing First Iowa Coop. v. Power Commission, 1946, 328 U.S. 152, 66 S.Ct. 906, 91 L.Ed. 1143).

Reduced to its simplest terms, the argument of the Public Service Commission under the first two heads of its brief is this: there is only one plan before the court, and that embodies a provision for approval by the state commission. This approval has been refused. Therefore, the only proper disposition of the matter is a remand to the Securities and Exchange Commission for such action as may be found proper. I take it from this that, if

the plan had been remanded, and the Securities and Exchange Commission itself had deleted the requirement for approval by the state commission, and if then the matter were again brought on, the objection now urged, as I have just described it, would be eliminated. But on March 24, 1947 (the adjourned date of the hearing) the Securities and Exchange Commission, through its spokesman, an officer of the court, stated that approval was not essential. And the application for an enforcement order was still pressed, although the Securities and Exchange Commission then had full knowledge of the fact that approval of the plan had been expressly denied by the Public Service Commission. Analysis of the ground, or at least the major ground, of this action leads inevitably to the conclusion that remand, and modification of the plan in the respect suggested, would leave the controversy exactly where it is now.

For overshadowing all other questions in the case is the jurisdictional clash between two important governmental agencies, one state and one federal: a disagreement in principle which, as I believe, cannot be composed. Evaluation and allocation of the new common stock to Long Island, in lieu of its present stock holdings, is the rock upon which the two commissions have split. If the old common stock is to be evaluated upon an asset basis, then it can well be argued, as the state commission does, that there is nothing fair and equitable about a plan which gives Long Island anything in lieu of its present stock interest, because it is valueless. On the other hand, if the formula of potential earning value is to be used, then much can be said in support of a distribution under which Long Island receives at least some small fraction of the new stock. The memorandum of the state commission dated March 6, 1947, is conclusive on the point that it would never sanction evaluation of the present Kings common stock (held by Long Island) on an earning basis. And every word that has been said, and every line that has been written, in connection with this application by the Securities and Exchange Commission is to the effect that it regards itself as bound under the

federal precedents to use potential earnings, not assets, as the yardstick of value. This is not a difference of opinion which lends itself to adjustment by any process of reconciliation or arbitration: someone must yield, and remand would be merely futile. The situation here is not unlike that dealt with in Application of Securities and Exchange Commission, D.C.D.Del., 1943, 50 F.Supp. 965. There, persons objecting to the approval of the plan offered to show that a vote of corporate stockholders (apparently one of the stated features of the plan) was, in fact, invalid, and, therefore, approval of the plan should be withheld. Judge Kirkpatrick took the position (50 F.Supp. 965, 966): "(a) that the so-called self-limitation requiring a stockholders' election was not intended to (and did not) affect the operation of the plan, and (b) that the plan could be enforced by this Court without any vote of the stockholders"

■ I think everyone would agree that remand is not inflexibly required whenever it appears to the court, which is asked to enforce an order of the Securities and Exchange Commission, that *any* condition embodied in the plan, or the terms of approval, has not been met, or *any* preliminary step omitted. It would seem much more sensible that the action taken by the court should depend upon whether the omitted step or condition is essential. And, if I am right in this, remand is extremely undesirable when, in all human probability, the omitted step or condition can never be taken or met. I agree thoroughly with the position taken by counsel for the state commission that, under my narrow statutory jurisdiction I could not *amend* a proposed plan. For example, I could not, in the case at bar approve the plan on condition that Long Island receive, not 7½% of its present common stock holding, but 3¾%, this representing a compromise between the views expressed by the two commissions. Any such disposition would be wholly without jurisdiction. But I do think I am free to examine the question whether the approval and consent of the Public Service Commission is such an essential feature of the plan that failure to secure it requires remand and further action by the Securities and Exchange Commission.

■ The Public Service Commission points out that, in no uncertain terms, counsel for Kings, in a written opinion filed with the modification of the company's plan, took the position that the plan would not be valid without the consent and approval of the Public Service Commission to the amendment of the certification of incorporation, New York Stock Corporation Law, Consol.Laws, c. 59, sec. 38, subd. 1, that the state commission's order permitting revision of the company's capitalization must be secured, and that after the obtaining of an enforcement order it will be necessary to file in the office of the Secretary of State of the State of New York an amendment to the certificate of incorporation.[3] However, this does not

3 There was submitted at the argument on behalf of the Secretary of State a brief fully subscribing to the views of the Public Service Commission as to the necessity, or at least desirability, of remand. It is urged in this brief that in its findings and opinion (December 13, 1946) the Securities and Exchange Commission never considered the question of any possible conflict with the Public Service Commission and that, because of this, remand is highly advisable, since this would give the Securities and Exchange Commission the opportunity of deciding whether, assuming the existence of "an overriding federal power", it should be exercised in this case. In support of this position, the Secretary of State calls attention to Securities and Exchange Commission v. Chenery Corp., 1943, 318 U.S. 80, 63 S.Ct. 454, 87 L. Ed. 626, and Connecticut Co. v. Power Commission, 1945, 324 U.S. 515, 65 S. Ct. 749, 89 L.Ed. 1150. In the Chenery case, the federal commission had undertaken to decide a question of law adversely to the petitioner. The majority thought that the administrative order could not be upheld, absent a showing of the factual grounds upon which the agency decided the question. In the Connecticut Light and Power Co. case a majority of the Supreme Court thought that the Federal Power Commission had misread certain decisions, and, as a result of this, might have improperly extended its jurisdiction over the petitioner because of an erroneous view of the law. Of course, there is no close analogy between those cases and the case at bar.

settle the question whether the statute itself makes the agreement of the Public Service Commission so far essential that a plan must be remanded, even when it is clear that the state authorities will never approve *any* plan, unless the Securities and Exchange Commission radically revises its method of evaluating the common stock. I can see why the Public Service Commission emphasizes these views of counsel for Kings. If the consent and approval of the state commission is, on the papers before me, so vital a feature of the plan to counsel for the company affected, then absent this consent, it surely can be argued that remand becomes a practical necessity, regardless of what the law may be. However, the brief of the company makes it clear that its sole interest is to obtain, without undue delay, the permission required to effectuate some plan for the revision of its capitalization. And the company neither asserts or denies that the statutory powers of the Public Service Commission over recapitalization of utility companies override the corresponding power claimed for the Securities and Exchange Commission. Indeed the company asks me to determine this issue, so that its capitalization can be promptly revised.[4] If this is to be done, I have no alternative except to pass upon the argument, advanced in behalf of the Public Service Commission, that its approval and consent to any plan of reorganization of Kings is required both under state and federal law.[5]

### The Bearing of the Federal Statute.

 Beyond question, the statutes of New York require approval by the Public Service Commission (1) of any amendment in the certificate of incorporation of a company subject to the provisions of the Public Service Law, Consol. Laws, c. 48, Stock Corporation Law, sec. 38, (2) of the issuance of any securities by a gas corporation or an electric corporation, Public Service Law, sec. 69, and (3) of the effectuation of any plan to change the corporate structure without the approval of stockholders of any corporation subject to the jurisdiction of the state commission, Stock Corporation Law, sec. 26-a. And the cases establish, as one would suppose they ought, that the duties of the Public Service Commission in such matters are quasi-judicial. Rochester Gas & Electric Corporation v. Maltbie, 1940, 258 App.Div. 682, 18 N.Y.S.2d 630, affirmed 284 N.Y. 626, 29 N.E.2d 936; Staten Island Edison Corp. v. Public Service Commission, 1934, 263 N.Y. 209, 188 N.E. 713. But the question before me is whether the effect of the federal statute, so far as it bears upon the proceeding at bar, is to deprive the Public Service Commission of jurisdiction, at least pro tanto, and, in this way, to remove Kings for limited purposes from the operation of these state statutes and decisions. In other words, the question here is whether the situation before me does or does not come within the well established rule that where Congress, in the exercise of its constitutional powers, passes an act conferring powers on a federal body, the several states have been deprived of authority to confer the same powers on a state body.

Passing, at least at this point, the constitutional question, I must decide whether Congress has, in fact, granted powers to the Securities and Exchange Commission which collide with the powers claimed for the Public Service Commission over the same subject matter.

There can be no doubt that the federal act, sec. 11(e), confers upon the Securities

---

Here the Securities and Exchange Commission argues that the approval and consent of the state commission is not required by the underlying statute, and that an enforcement order can be granted in the absence of such consent or approval, even though the plan under consideration provides for it. So far as I am aware, nobody is claiming that the Securities and Exchange Commission, in the instant case, has made an erroneous decision of law which is reflected in the plan, or that the decision of any question involved in the application to enforce must rest upon fact findings which the federal commission has failed to make.

[4] Here I have practically paraphrased the concluding language of the memorandum submitted by Kings.

[5] Memorandum of the Public Service Commission of the State of New York, points III and IV.

and Exchange Commission the power to make an order approving a plan submitted by the subsidiary of any registered holding company—a plan for the divestment of control, securities, or other assets, or for other action by such company for the purpose of enabling it to comply with the provisions of sec. 11(b) of the same statute. But the state commission argues that its own jurisdiction and its own powers under the state statutes which I have mentioned and others, remain intact, because the federal act provides, sec. 7(g), that, where any state commission has jurisdiction over the matters mentioned in sec. 6(a) of the federal statute (issuance of securities), then if that state authority "shall inform the Commission, upon request by the Commission for an opinion or otherwise, that State laws applicable to the act in question have not been complied with, the Commission shall not permit a declaration regarding the act in question to become effective until and unless the Commission is satisfied that such compliance has been effected." The argument of the Public Service Commission is that sec. 7(g) of the federal act, which I have just quoted in part, is a limitation upon the power of the Securities and Exchange Commission in proceedings under sec. 11(e), certainly to the extent that operating subsidiaries like Kings may be involved. And the state commission goes further: it says that plainly the federal lawmakers intended to restrict federal power over operating subsidiaries by an exception found in sec. 11(b) (2), of the statute: "Except for the purpose of fairly and equitably distributing voting power among the security holders of such company, nothing in this paragraph shall authorize the Commission to require any change in the corporate structure or existence of any company which is not a holding company, or of any company whose principal business is that of a public-utility company."

On the basis of these statutory provisions, the Public Service Commission argues that there really is, and should be, no collision between itself and the Securities and Exchange Commission, when it comes to the question of power to approve a plan of recapitalization for a public utility oper-ating company. The meaning of the statute, it urges, is that, despite what may seem the broad language of the portion of the statute upon which the application is grounded, sec. 11(e), the federal commission may go no further than to require changes which will fairly and equitably distribute voting power, sec. 11(b) (2), and where such changes make necessary the issuance of securities or the alteration of preferences or voting power, sec. 6(a), then there is a statutory mandate upon the commission to satisfy itself that there has been compliance with state statutes, sec. 7(g).

And so, as I have intimated, the state commission reaches the conclusion that there is no collision of powers here involved, and that the statute does not give the Securities and Exchange Commission power to approve recapitalization of a public utility operating company, and to carry out the plan, in the face of disapproval by the state authorities.

## Section 11(b) (2) of the Federal Statute.

██ ██ I turn first to the exception found in sec. 11(b) (2) of the statute. It is perfectly clear that Congress was attempting to make some kind of distinction between the power of the Securities and Exchange Commission over holding companies, on the one hand, and public operating utility companies, on the other. Changes in the corporate structure of an operating company could be justified only on the basis of the fair distribution of voting power. Perhaps this exception was inserted because the language just preceding it, to the extent that it dealt with *systems,* would have been so broad if also applied to individual operating companies that it would have gone beyond anything Congress felt the situation required. For example, when the commission deals with systems, it may find it necessary to eliminate a company altogether because its existence unnecessarily complicates the structure of the system, sec. 11(b) (2). The exception may, therefore, have been inserted in the act to clarify and limit the powers of the commission when dealing with a single operating company. But I do not believe the exception will bear the in-

terpretation which the Public Service Commission seeks to put upon it. True enough, the commission is set in motion only when it seeks to achieve the *purpose* involved (to bring about the fair and equitable voting power). But if that purpose ought to be achieved, as is manifestly true in the case at bar, then it is very difficult to see how the change can be effected without, in many cases at least, redistributing stock, reclassifying stock, and, in general, making other subsidiary changes which flow naturally from any recapitalization calculated to accomplish the stated purpose. Cf. In re Jacksonville Gas Co., D.C.S.D.Fla., 1942, 46 F.Supp. 852.[6] If I am wrong in this, then once the desirability of a redistribution of voting power is made manifest (the purpose), whatever fair and equitable changes are found necessary to accomplish this may be included in the commission's order (i.e., it may require "any change in the corporate structure" reasonably adopted to effectuate the purpose).

### Section 7(g) of the Federal Statute.

The Public Service Commission argues that the federal commission has no power to approve a plan to change the capital structure of a utility operating company, unless the plan complies with state law. And the language of sec. 7(g) of the federal statute, it must be admitted, gives great plausibility to this argument. It provides, as I have said, that if a state commission "having jurisdiction over any of the acts enumerated in subsection (a) of section 6" shall inform the federal commission that applicable state laws have not been complied with, then the commission may not permit a declaration to become effective until it is satisfied that there has been compliance with these state laws. Now, sec. 6(a) of

the federal statute concerns itself with the issuance and sale of securities by any registered holding company, or subsidiary, or with the exercise of any privilege or right to alter priorities, preferences, voting power, or other rights of the holders of outstanding securities of that company. As has been seen, sec. 11(e) of the statute confers upon the federal commission the power to determine the fairness of a plan to divest a subsidiary company like Kings of control, securities, or other assets, or for such other action as may enable the company to comply with the objects of sec. 11(b), among which are the correction of voting power inequitably distributed. It happens in the case at bar, and it will happen in a great many cases, that, in the exercise of the power just touched upon, the plan of recapitalization submitted under sec. 11(e) will necessarily involve the issuance of new securities and changes in the voting rights and preferences of holders of outstanding securities. Cf. sec. 6(a). Then if sec. 7(g) means what the Public Service Commission says it does, inevitably the state authority has a veto power over any action of the federal commission taken pursuant to sec. 11(e).

I am inclined to think that sec. 7(g) of the statute does not have the broad application for which the Public Service Commission contends. It may well be that sec. 7(g) comes into operation only with respect to changes in corporate structure not within the ambit of sec. 11(e). But it cannot be denied that, in prior proceedings under sec. 11(e) of the federal statute unrelated to this one, the federal commission has, in fact, applied sec. 7(g) as an interrelated statutory section, and has insisted upon the consent and approval of the state authority, even when it (the federal commission) has

---

[6] It is fair to say that the Public Service Commission criticizes this case, because, under the law of Florida, there does not exist any body with powers analogous to those of the New York Commission. However, I do not believe that Judge Strum's analysis of the exception found in sec. 11(b) (2) is in any way influenced or changed by this fact. He seems merely to be construing the statute itself, uninfluenced by the existence or non-existence of wide regulatory powers in any state body. And I agree with everything he says, particularly (46 F.Supp. 852, 857) where he points out that sometimes inequities can be corrected by adjustments in the corporate structure of the holding companies themselves, but that where intrinsic inequity in the distribution of voting power is found in the structure of the operating company, then "comprehensive internal reorganization, affecting all classes of security holders" may be necessary.

planned changes calculated to correct inequities in the distribution of voting power. Even so, this prior pattern of action on the part of the federal commission certainly does not take on the quality of an estoppel. See Phillips v. Securities and Exchange Commission, 2 Cir., 1946, 153 F.2d 27, 29, footnote 3. It has very recently been pointed out by the Supreme Court that the Securities and Exchange Commission must be free to act either by general rule or by individual order, and that flexibility of administrative procedure to make it capable of dealing with specialized problems is highly desirable. Securities and Exchange Commission v. Chenery Corporation, 67 S. Ct. 1575. And so the fact that the federal commission has been alert and anxious to insure parallel action by state or federal authority is not at all controlling upon the meaning of sec. 7(g) of the statute.

■■ If that section has the meaning ascribed to it by the Public Service Commission, then manifestly any state authority can frustrate action by the federal commission under section 11(e). No better example can be found than the proceeding at bar. At the risk of wearisome repetition, I point out again that if the state commission has the veto power which it asserts under sec. 7(g) of the statute, then here the Securities and Exchange Commission must discard its potential earning basis for allocation of the common stock, and must accept the standard (asset value) which the state authority considers more nearly equitable and feasible. Unless the federal commission yields, the voting power of Kings, a subsidiary of a public utility holding company, can never be redistributed according to the mandate of sec. 11(e) of the statute. Certainly the Supreme Court has solved a very similar problem by deciding that under the Federal Power Act a statutory provision for state approval, seemingly a quite unequivocal command, was nothing more than a "suggestion" to federal authority. In First Iowa Coop. v. Federal Power Commission, 1946, 328 U.S. 152, 66 S.Ct. 906, 90 L.Ed. 1143, the Federal Power Commission had dismissed an application for a license because the State of Iowa, intervening, had pointed out that the petitioner had failed to comply with the state statute. This action of the commission was predicated upon a requirement found in the federal statute requiring applicants for a license to submit satisfactory evidence of compliance with state laws relating to certain specified matters.[7] It seems to me that the majority opinion in the First Iowa Coop. case sets forth much more clearly and cogently than I could the reasons why, in this case, sec. 7(g) should not be read as such a limitation upon the powers of the Securities and Exchange Commission that state authority can exercise a veto power over the exercise by the federal commission of highly important powers vested in it by the same act, sec. 11(e). No better example of the evils of dual control could be afforded than is found in the case at bar, if Kings is bound, pursuant to federal direction, to reallocate its common stock on an earnings basis and, pursuant to state direction, to reallocate that same stock on an asset basis. If both of these commands must be followed, the stock will

---

[7] This is sec. 9(b) of the Federal Power Act, 16 U.S.C.A. § 802(b). For clarity, I set forth in parallel columns the two statutes:

The requirement of the Federal Power Act, 16 U.S.C.A. § 802(b) considered in the First Iowa Coop. case:

"Satisfactory evidence that the applicant has complied with the requirements of the laws of the State or States within which the proposed project is to be located with respect to bed and banks and to the appropriation, diversion, and use of water for power purposes and with respect to the right to engage in the business of developing, transmitting, and distributing power, and in any other business necessary to effect the purposes of a license under this chapter."

The requirement of the Public Utility Holding Company Act, sec. 7(g), here under discussion:

"If a State commission or State securities commission, having jurisdiction over any of the acts enumerated in subsection (a) of section 6, shall inform the Commission, upon request by the Commission for an opinion or otherwise, that State laws applicable to the act in question have not been complied with, the Commission shall not permit a declaration regarding the act in question to become effective until and unless the Commission is satisfied that such compliance has been effected."

never be reallocated and Long Island will continue to exercise unfair and inequitable control over Kings' voting power, a control which both the state and federal commission, to say nothing of the stockholders, are anxious to terminate as speedily as possible. It is unnecessary for me to decide, and I do not attempt to decide, exactly what the impact of sec. 7(g) is upon sec. 11(e) or other portions of the statute. I do decide that when irreconcilable conflict arises between the state and federal authority concerning how stock is to be reallocated, then, despite the provisions of sec. 7(g), the federal statute overrides state statutes which clash with it, assuming that the federal statute is constitutional.

### The Constitutional Argument.

The Public Service Commission says in its brief that, if the Public Utility Holding Company Act is to be construed as an overriding statute, then it is unconstitutional, because (a) the connection of Kings with interstate commerce is so indirect and remote that it would not support the application to it of an act assuming to override the state's primary interest in public utility corporations operating within the state, and (b) corporations, in general, are so peculiarly within the plenary jurisdiction of the

state which creates them, that their capital structure may not be changed without the consent of that state.[8]

**■■** (a) Although, as I have pointed out, the securities of Kings, the company sought to be recapitalized, are distributed widely among investors in many states, it cannot be denied that its own *operations* are wholly intrastate.

In *Matter of Niagara Hudson Power Corporation and Subsidiary Companies* (Holding Company Act, Release No. 5115), the Securities and Exchange Commission concluded that the granting of an exemption from the statute would be detrimental to the public interest, and to the interests of investors and consumers. In its opinion, the federal commission seems to acknowledge, at least *arguendo,* that the system operated by Buffalo Niagara and its subsidiaries could be regarded as predominately intrastate in character. Nevertheless, it characterized inequitable distribution of voting power as one of the evils which, because of nation wide sale of securities, was interstate in scope, and of the character which it is the declared policy of the federal statute to eliminate. In the proceedings to modify or revoke an exemption theretofore granted Long Island (Holding Company Act, Release No. 5746),

---

8 These two arguments are found respectively in points V and VI of the Public Service Commission's brief. I may as well say at this point that ever since the argument there has been grave doubt in my mind whether I ought to pass upon any constitutional questions here. This doubt concerns itself with the right of the Public Service Commission here to raise any such questions. In his concurring opinion in Ashwander v. Tennessee Valley Authority, 1936, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688, Mr. Justice Brandeis (297 U.S. 348, 56 S.Ct. 483) says that one of the rules under which the Supreme Court has avoided passing upon constitutional questions is that under which no one may challenge the validity of a statute who fails to show that he is injured by its operation. As an example, under this rule he mentions the case where the challenge is by a public official interested only in the performance of his official duty, and says that such challenge will not be entertained, citing Columbus & Greenville R. v. Miller, 1931, 283 U.S. 96, 51 S.Ct.

392, 75 L.Ed. 861. The facts in the Columbus & Greenville R. case are not close to those in the proceeding at bar; but the gloss put upon the case by Mr. Justice Brandeis has bothered me here. Neither the preferred stockholders, nor any security holders of Kings, nor the company itself challenges the constitutionality of the statute. And it is strongly hinted in the briefs submitted by the Public Service Commission and by the Secretary of State of New York that, whatever the outcome of the proceeding at bar may be, further proceedings will be necessary to clarify the position of the state agencies involved. All of the circumstances strongly indicate that I should refrain from deciding any constitutional question, even though none of the litigants has argued that I should not take that course. However, I proceed to consider the question because I think the decision here should be as complete as I can make it, and because counsel, if called upon, might conceivably be able to supply an answer to my own doubts.

the federal commission, on the basis of substantial evidence of the same character (i. e., wide interstate distribution of securities) likewise reached the conclusion that it was in the proper public interest to terminate the exemption of Long Island. Again, the commission noticed, but considered immaterial, the fact that the operations of Long Island and its subsidiaries were predominately intrastate in character within the meaning of sec. 3(a) (1) of the act as they are now. Nobody, up to the present, seems ever to have attempted directly to challenge these findings. And, as I have said at an earlier point in this memorandum, the compliance affidavit filed in this proceeding shows that as recently as January 5, 1947, the securities of Kings were still widely distributed throughout the nation—a distribution that could only have been accomplished through the instrumentalities of interstate commerce. Therefore, if the declared purpose of the Public Utility Holding Company Act of 1935, sec. 1(a) (1) of the statute, is to be given effect, Kings, equally with its parent holding company, was and is properly subject to the jurisdiction of the Securities and Exchange Commission and to the provisions of the statute. There is no suggestion on the part of the Public Service Commission that the securities of Kings are not widely distributed, nor that the distribution did not involve the use of the instrumentalities of interstate commerce. And, therefore, under the first subdivision of their argument against the constitutionality of the statute, the Public Service Commission must mean that the 10th Amendment to the Constitution denies Congress the power to regulate public utility companies whose *operations* are predominately or exclusively intrastate, but whose securities are listed on national exchanges and widely distributed throughout the nation. Counsel have mentioned no precedent which squarely decides this question either way. But, on principle, I should think that to accept the argument of

the Public Service Commission would be practically to delete the interstate commerce clause, at least as it is now understood, from the Constitution. For example, it is difficult for me to see any vital distinction, so far as underlying federal power is concerned, between a statute which prohibits the interstate shipment of stolen automobiles, or of firearms, and one which regulates the interstate distribution of securities. Yet, if the contention of the Public Service Commission is correct, all of the statutes which are grounded upon the notion that the interstate commerce clause is broad enough to permit Congress to protect the stream of interstate commerce are unsound. And I have not touched upon the point that the so-far unchallenged subjection of the parent holding company (Long Island) to the provisions of the act would produce a chaotic condition if its wholly owned subsidiaries are exempt.[9] Read as a whole, the act certainly contains no internal evidence that Congress intended any such unworkable legislation. But if the contention of the state commission must be adopted, that will be the result.

The Public Service Commission cites, in support of its contention, three cases, all readily distinguishable on the facts, North Carolina v. United States, 1945, 325 U.S. 507, 65 S.Ct. 1260, 89 L.Ed. 1760, Texas v. Eastern Texas R. Co., 1922, 258 U.S. 204, 42 S.Ct. 281, 66 L.Ed. 566, and Smyth v. Asphalt Belt R. Co., D.C.W.D.,Tex., 1923, 292 F. 876. The North Carolina case holds simply that the Interstate Commerce Commission, before it can supplant the state authority, must make a finding of fact concerning the relationship between the interstate rate level and the rate established for intrastate coach traffic. Without such a finding, the intrastate rates could not be held discriminatory against interstate commerce. In the Eastern Texas R. Co. case the District Court had dismissed a suit by the State of Texas to annul an order and certificate of the Interstate Commerce

---

[9] As I have said, Long Island owns 97.736% of the common stock of Kings. Moreover, Long Island has been held subject to the act, because, in addition to its holding company activities, the commission found (Holding Company Act, Release No. 5746) that a substantial portion of Long Island's own power sales were made to industrial and commercial consumers engaged in interstate commerce, and a substantial portion of its revenues derived from such sources.

Commission. The Supreme Court held that to the extent the certificate related to purely intrastate operations of railroad, it did not have the effect claimed for it, because both the Transportation Act, 49 U. S.C.A. § 71 et seq., and the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., were intended to regulate interstate and foreign commerce, and to affect intrastate commerce only to the extent that interference with it was incidental to regulation and protection of interstate commerce. In the Smyth case the doctrine of the Eastern Texas R. Co. case was applied. Statutes of the State of Texas, supposed to clothe the defendant with obligations to engage in interstate commerce, were held unenforcible: it was said that if, in fact, the defendant had no intention to engage in interstate commerce, it was possible for it still to maintain its character as an intrastate railroad. I think a mere statement of these holdings demonstrates that no one of them is a binding precedent on the question here under discussion.

 (b) It is further asserted by the Public Service Commission that the federal statute, unless it be construed to require the consent of the state to alterations in the capital structure of the corporations which it has created, is an invasion of the plenary jurisdiction of the state over such corporations. To sustain this position, reliance is placed upon Hopkins Savings Association v. Cleary, 1935, 296 U.S. 315, 56 S.Ct. 235, 80 L.Ed. 251, 100 A.L.R. 1403, and Title Co. v. Wilcox Bldg. Corp., 1937, 302 U.S. 120, 58 S.Ct. 125, 82 L.Ed. 147. But in the Hopkins Savings Association case everything said by Mr. Justice Cardozo on the subject of the sanctity of corporations is conditioned by the remark at the very end of his opinion (296 U.S. 343, 56 S.Ct. 244): "No question is here as to the scope of the war power or of the power of eminent domain *or of the power to regulate transactions affecting interstate or foreign commerce.*" (Emphasis mine).

And the *Title Co.* case holds that a corporation, dissolved by act of the state which created it, may not invoke the bankruptcy powers of a federal court. Really the question before the court was a very limited one: it was a question of capacity; the majority held that dissolution of the corporation was equivalent to death for all purposes: the dissenters, speaking through Mr. Justice Cardozo, took the position that, at the very least, the corporation had enough vitality to commence the federal proceeding. No one could possibly deny that corporations, as a general thing, derive their existence from the state which created them. But to say that this fact confers upon the state a veto power over changes in corporate structure proper and necessary under a federal statute, in a field entrusted to Congress by the Constitution, is certainly to rob the interstate commerce clause of any real meaning. Analogies drawn from bankruptcy legislation are, for reasons which need not be detailed here, not persuasive when the question to be decided concerns itself with federal power over interstate commerce and its instrumentalities. It is an understatement to say that bankruptcy problems are sui generis, when state-created rights are involved.

(c) If the question is properly before me, I hold that the Public Utility Holding Company Act is valid in respect of the constitutional challenges here interposed.

### Is the Proposed Plan Fair and Equitable, and Calculated to Accomplish the Objects of the Statute?

 I turn now to the question, the resolution of which will determine whether or not an enforcement order should be granted, namely, whether the plan is fair and equitable, and reasonably calculated to accomplish the purposes laid down in the statute. I have previously made mention of the memorandum of the Public Service Commission dated March 6, 1947, which sets forth in great detail objections to the plan, objections which led the state commission to conclude that the application pending before it as a unit should be denied as inequitable, that the application gave no basis to the Public Service Commission for the making of findings required by the New York Public Service law, and that adoption and enforcement of the plan is not in the public interest. Counsel for the state commission very properly urges that it is not my function here to "review" this

action: that a remedy is provided under state law for any party aggrieved, New York Civil Practice Act, Art. 78, and that the order may not be reviewed in any other manner. I agree with all this: a review here of the action of the Public Service Commission, as such, is wholly beyond my jurisdiction.

■ However, in dealing with the question whether the plan here sought to be enforced is fair and equitable, and reasonably calculated to carry out the mandate of the federal statute, I believe that I can and should consider the objections advanced by the state commission. I think that on an application of this sort any and all available material should be used to determine the fairness or unfairness of the proposed plan, regardless of the source or form of that material.

■ The bulk of the Public Service Commission's memorandum is devoted to a painstaking analysis of the financial condition of Kings, calculated to demonstrate that, on an asset basis, the present common stock of the company is worthless, and not entitled even to nominal participation in the new common stock to be issued. This analysis, and this opinion are entitled to the greatest respect in any forum. And the argument that the criterion of asset value, rather than that of potential earning power, should be mainly employed is, I must admit, cogent as an argument. The Securities and Exchange Commission, on the other hand, defends its use of earning power as the main yardstick of allocation, and points to the unfairness of treating reorganizations under the federal statute as if they were insolvency proceedings in which senior securities have matured. But the federal commission goes further. It argues, with considerable support in the decided cases (e.g., Consolidated Rock Co. v. Du Bois, 1941, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982), that here to use a sum of values based on physical factors, and assigned to separate units of the property without regard to the earning capacity of the whole enterprise would be plainly inadequate. This problem of conflicting standards was dealt with lately. In re Interstate Power Co., D.C.D.Del., 1947, 71 F.Supp. 164. And much that is said by

Judge Leahy, after a careful review of the federal precedents, can be said here to support the action of the federal commission.

Although, on the face of it, the old common stock is to receive 7 1/2% of the new, this really overstates the case. The Securities and Exchange Commission points out that, assuming adjusted consolidated net assets of the company to be available in the amount of $4,689,894, the preferred shareholders under the plan will receive a participation equal to 96.23% of this amount, made up of preferred stock ($2,200,000), cash ($194,871), and common stock (pro forma net asset value, $2,122,896). The old common stock will receive 3.77% of the aggregate of the adjusted consolidated net assets applicable to all the capital stock of the company (common stock: $172,127). On an earning basis, the federal commission urges, assuming a probable consolidated net income of $326,500, the present preferred shareholders will receive a total of $308,612 (4% dividends—preferred stock $88,000; $220,612 on the common stock to be allocated). The existing common stock, on the other hand, will participate in these earnings only to the extent of $17,888. Thus, the assumed earnings will be divided in the proportion of 94.52% to the preferred stockholders and 5.48% to the present common stockholders. But, since the participation of the present common stock is junior to the new preferred dividends, the percentage stock participation given for that stock in earnings (5.48%) is really an overstatement.

Actually, it did seem to me on the argument, and I still think, that the proportion of new common stock proposed to be allocated to the old common shareholders is little better than a "nominal" proportion both of assets and of earnings. And obviously the plan does redistribute voting power in a fair and equitable manner, sec. 11(e): it places the voting control where it belongs.

I have previously mentioned that the financial statements, upon the basis of which the plan has been formulated, all bear the date of April 30, 1946. The state commission, as I have said, criticizes the plan as a whole, and in detail, on the ground that asset value, not earning power,

is the prime consideration and test to be used in the redistribution of the stock and recapitalization of the company. But it goes further and says that on the score of potential earnings the federal commission is far too optimistic. To point up this contention, the Public Service Commission supplies figures showing that at December 31, 1946, the financial condition of Kings had deteriorated as against its April 30th condition. In this fact the state commission finds confirmation for its belief not only that potential earnings as a standard of distribution furnish a treacherous guide, but also that at the date of hearing the underlying facts now demonstrate conclusively that the plan is unfair and inequitable.

But if earnings are to be used as a principal standard of recapitalization, it will always be true that some particular accounting period may yield the conclusion that the standard used is unreliable—a conclusion that may lose its validity if a longer accounting period is used. At best, there can be no mathematical certitude but only an estimate of how the plan will work, as the cases say. To paraphrase the language of Consolidated Rock Co. v. Du Bois, supra, 312 U.S. 510, 526, 61 S.Ct. 675, 85 L.Ed. 982, so long as the estimate is based on an informed judgment embracing all facts relevant to future earning capacity, taking into consideration the nature and condition of the properties, the past earning record, and all circumstances indicating whether or not that record is a reliable criterion, the Securities and Exchange Commission has properly discharged its function. And it has done so here.

██ There is ample support in the record to sustain the findings of the commission, and its conclusion that the proposed plan, as amended and modified, is fair and reasonable. And I also find that it is.

### Conclusion.

I have omitted to say, up to this point, something that certainly should be said. Both the Public Service Commission of the State of New York and the Securities and Exchange Commission have enviable records as administrative bodies. They deal with problems of great importance. Each uses its own statutory standards and its own accumulated experience in the solution of these problems. The judgment of each is an informed expert judgment. Obviously, the federal commission has tried not to treat the New York Public Service Commission, and other like state agencies, as mere poachers upon the national preserve. And by the same token the extreme rarity of controversies like this demonstrates a similar co-operative attitude on the part of the New York state commission. There is here an irreconcilable conflict of policy. The state is attempting to enforce a recapitalization policy different in its conception from that employed by the federal agency. It is unfortunate that there should be any controversy at all, but this is a penalty we must pay for our federalism. And when controversies like this one arise, some one must yield. Very recently the Supreme Court, Bethlehem Steel Co. et al. v. New York State Labor Relations Board, 67 S.Ct. 1026, dealt with a similar controversy in another field. And Mr. Justice Jackson points out that there are situations in which state action is forbidden even where federal policy is not settled. The proceeding at bar reveals not a possible but an actual clash of policy between experts—a difference of opinion about how discretion is to be exercised and judgment formed. To paraphrase Mr. Justice Jackson's language, concurrent jurisdiction in the two agencies can produce nothing but mischievous conflict.

██ As far as I am concerned, my duty is at an end when I find, as I do, that the action of the Securities and Exchange Commission was based upon findings supported by evidence, and was made pursuant to authority granted by Congress. I do not pretend to have either technical competence or legal authority to pronounce upon the wisdom of the course taken by either commission. Board of Trade v. United States, 1912, 314 U.S. 534, 548, 62 S.Ct. 366, 86 L.Ed. 432; National Broadcasting Co. v. United States, 1943, 319 U.S. 190, 224, 63 S. Ct. 997, 87 L. Ed. 344; both of which cases are cited in Securities and Exchange Commission v. Chenery Corp., 67 S. Ct. 1575.

The application is granted.